CONNECTICUT STATE MEDICAL SOCIETY ET AL. *v.*
CONNECTICUT MEDICAL SERVICE, INC.

SUPERIOR COURT      HARTFORD COUNTY      FILE NO. 173870

Memorandum filed December 27, 1971

*Howard, Kohn, Sprague & FitzGerald,* of Hartford, for the plaintiffs.

*Tyler, Cooper, Grant, Bowerman & Keefe,* of New Haven, for the defendant.

RUBINOW, J. The plaintiffs in this action are Connecticut State Medical Society, Hartford County Medical Association, Inc., and four physicians licensed to practice medicine in this state. These physicians will be hereinafter referred to as the individual physicians. Both of the plaintiff medical organizations are professional associations composed of physicians licensed to practice medicine in this state.

The defendant, hereinafter referred to as CMS, is a nonprofit medical service corporation incorporated in 1949 under statutes which correspond now to General Statutes §§ 33-168 through 33-179. The purpose of a medical service corporation, as spelled out in § 33-168, is to establish, maintain, and operate a plan whereby medical service may be provided, at the expense of the corporation, to subscribers to the plan under a contract entitling them to certain medical services. Prior to 1969, most of the CMS subscribers had either the "community contract" or the "preferred contract." Both of these contracts provided for (a) direct payment by CMS to "participating physicians" who rendered medical services to subscribers, and (b) payment to subscribers for medical services rendered to subscribers by "nonparticipating physicians." Thus, a nonparticipating physician would have to collect his fee directly from the subscriber, and CMS would pay to the subscriber the benefits due under the subscriber's contract. Both contracts also contained a provision whereby subscribers with low incomes would not have to pay a participating physician more than the benefit payable under the contract. This provision was known

as the service benefit provision. The two contracts differed primarily in the services covered, the benefits payable, and the amount of income which would make a subscriber ineligible for service benefits.

Between 1949 and 1969, each physician who wished to become a participating physician in the CMS plan signed an agreement with CMS in which he agreed to furnish services to CMS subscribers "in accordance with the terms and limitations of any contract between . . . [CMS] and its subscribers." The participation contract also provided: "This agreement shall be for a period of one year from its effective date and thereafter shall continue indefinitely until cancelled by either party upon sixty (60) days prior written notice to the other."

I

In January, 1969, CMS offered to subscribers a new type of contract, the "century contract." The distinguishing provision of this contract is that, regardless of the subscriber's income, all payments made to participating physicians for medical services rendered to a century contract subscriber will be payments in full for those services, subject to a few nonrelevant exceptions. Early in 1968, CMS had notified all its participating physicians about this new contract and at the same time had notified them that physician participation in the century contract would be by means of an "agreement separate from the one which the physician has already signed for participation in the Preferred and Community Contracts."

On October 26, 1971, CMS sent a memorandum to all physicians who were not participating in the CMS century contract but were participating in the other CMS contracts. In this memorandum, CMS stated that effective January 1, 1972, there would

no longer be two kinds of participation; effective on that date, in the words of the memorandum, "to be a CMS Participating Physician . . . will require participation under all CMS contracts." Copies of the new participation agreement were enclosed with the memorandum, with instructions for executing and returning them. After the instructions about signing and returning the agreements, the memorandum contained the following paragraph: "If you choose not to sign them, this letter will serve as notice that the existing participating agreements between you and CMS will be terminated effective January 1, 1972. This notice is given in accordance with the terms of the Participating Agreement, which states that after one year from its effective date the agreement may be cancelled by either party upon sixty days prior written notice to the other."

In the complaint in the present action, the plaintiffs allege that the CMS policy of requiring a physician to be a participating physician in all or none of the CMS contracts constitutes a violation of Public Acts 1971, No. 608, the Connecticut Antitrust Act (General Statutes, c. 624), and in their prayer for relief they ask for a temporary and permanent injunction enjoining CMS from "requiring said physicians to belong to all or none of said plans." The present hearing was held to determine whether a temporary injunction should issue.

## II

Under § 11 of Public Acts 1971, No. 608 (General Statutes § 35-34), proceedings for an injunction under that act are governed by "the rules and principles governing the granting of injunctive relief." One of these principles is that no temporary injunction should issue if "it is very clear that the plaintiff is without legal right." *Olcott* v. *Pendleton,* 128 Conn. 292, 295.

This principle requires an inquiry into the legal right which the plaintiffs are seeking to enforce in this proceeding. Clearly, they are not seeking to enforce the right to invalidate an allegedly illegal contract already entered into or to prevent harm from arising from compliance with such an existing contract. Rather, they are seeking to prevent CMS from terminating or discharging an admittedly valid existing contract between CMS and the individual plaintiffs. What the plaintiffs want to do by the temporary injunction is to prevent CMS from terminating the participation contracts which CMS has with physicians who, in the past, signed up for partcipation in only preferred contracts and community contracts and will not now sign up for participation in all three contracts. In other words, the legal right which the plaintiffs are claiming is the right to have their existing participation contracts continued in force, even if they do not sign up for century contract participation.

It is clear from the existing contracts themselves that the plaintiffs have no such right. Each party to the contract is given the power to have the contract "cancelled" by giving "sixty days prior written notice to the other." There is no limitation upon the power of cancelation by a requirement such as "good cause" or "good faith." The only requirement is that of giving notice. When the sixty-day notice in the memorandum of October 26, 1971, expires, CMS has an unrestricted and unqualified right to cancel the participation contracts to which the cancelation notice applies.

## III

The plaintiffs claim that the all-or-none policy set forth in the memorandum of October 26, 1971, is an attempt to coerce the individual plaintiffs into entering into an illegal tie-in contract. The grava-

men of this claim is that if cancelation is in further-
ance of an act prohibited by Public Acts 1971, No.
608 (General Statutes, c. 624) cancelation may be
enjoined notwithstanding the specific provision in
the participation contract permitting cancelation
after a sixty-day notice. Even if the court were to
hold valid this claim of an implied limitation on the
power of cancelation, the court would not grant the
injunction, because the evidence at the hearing estab-
lishes that the CMS all-or-none policy clearly does
not constitute a violation of Public Acts 1971, No.
608.

The substance of the plaintiffs' claim is that all
contracts where a supplier agrees to sell product A
(the "tying" product) to a purchaser only on the
condition that the purchaser will buy product B (the
"tied" product) are per se illegal and violations of
the antitrust law. The federal antitrust cases, which
both parties have agreed are applicable in interpret-
ing Public Acts 1971, No. 608, do not support the
plaintiffs' claim. The rule in those cases is that
tying arrangements or agreements may fall in the
per se illegal category, "though not necessarily so."
*White Motor Co.* v. *United States,* 372 U.S. 253, 262.
Tying agreements "are unreasonable in and of them-
selves whenever a party has sufficient economic
power with respect to the tying product to appre-
ciably restrain free competition in the market for
the tied product and a 'not insubstantial' amount of
interstate commerce is affected." *Northern Pac. Ry.
Co.* v. *United States,* 356 U.S. 1, 6. Under those
criteria, many different kinds of tie-in contracts
have been held illegal per se. See *White Motor Co.*
v. *United States,* supra, 259; Turner, "The Validity
of Tying Arrangements under the Antitrust Laws,"
72 Harv. L. Rev. 50, 62 (listing categories of facts
found in illegal per se tie-in arrangements). The
facts in the instant case, however, differ in two sig-

nificant respects from every arrangement that has ever been held an illegal per se tie-in.

First: To obtain both the tying product and the tied product, the party to whom the products are offered, i.e. the physician, does not pay any money to CMS. In connection with that point of difference, the court notes that the tying product is not the community contract or the preferred contract but the right to be a participating physician under those contracts, and the tied product is not the century contract but the right to be a participating physician under that contract. It is true that, in lieu of money, CMS receives a potential and intangible economic benefit from the physician who signs the participation agreement. That benefit is the potentially better market for CMS contracts resulting from greater physician participation. It is also true that, in lieu of money, the participating physician "pays" the price of a potential and intangible economic detriment for the right to be, and the advantage of being, a participating CMS physician. That detriment is the agreement to charge less for his services to service benefit patients than he might otherwise charge and, for his services to patients covered by the century contract, to charge no more than the fee fixed in that contract. Nevertheless, it remains true that no money has been paid for either the tied or the tying product, and in no adjudicated case has it ever been held that a tie-in arrangement by the exchange of potential and intangible economic benefits and detriments, but involving no exchange of money, is illegal per se or even illegal. Undoubtedly, the reason for this is that a tie-in arrangement which does not require the purchaser to pay for the tying and tied products in money, or at least in some tangible with a standard value in terms of money, is not "trade" within the purview of the rule holding tie-in arrangements to be a "restraint of trade."

That rule is aimed at transactions in which a purchaser is required to buy, with money, something he might prefer to buy from someone other than the person from whom he is obligated, by the tying arrangement, to buy. The rule is not aimed at unique, moneyless transactions of the type here involved.

Second: There does not exist any "market" for the tied product or for a substitute for the tied product. Companies engaged in selling medical expense contracts compete with each other in the sale of the contracts; they do not compete in the sale or purchase of the right to be a participating physician.

Further, even if participating-physician rights are considered an integral part of the competition in selling medical expense contracts, a competitor of CMS is free to offer such rights, with respect to the competitor's contracts, to all physicians who are presently participating physicians in CMS; in turn, those physicians are under no financial or legal restraint which in any way hinders them from becoming participating physicians in the plan for any such competitive contracts. There is no reason why a physician should limit the number of companies that guarantee payment of his patients' bills, merely because CMS performs that function for him for its subscribers.

In sum, the evidence in this case establishes that the arrangement by which physicians obtain CMS participating-physician rights is not "trade"; that competitors of CMS are free to "sell" participation rights in their plans to CMS participating physicians; that the all-or-none policy of CMS does not restrict competition in the "market" for physician-participation rights; and that, accordingly, the all-or-none policy of CMS is neither illegal per se nor illegal on its facts.

There are two other markets that might conceivably be affected by the all-or-none policy. The first of these is the market for the dollars of the subscriber. It is arguable that the all-or-none policy may enable CMS to sell more century contracts and thus give it an advantage over competing plans; this would be argued on the theory that the more physicians who participate in the century contract, the more attractive the century contract will be to potential subscribers. There was, however, no specific evidence of this offered at the hearing. Further, the advantage that CMS would have from greater physician participation does not result from making physicians less accessible to competitors of CMS. The all-or-none policy does not prevent a competitor who develops a similar contract for subscribers from entering into participation agreements with physicians who have entered into a participation agreement with CMS, and the all-or-none policy does not prevent such a competitor from signing up CMS subscribers. Although the greater physician participation may give CMS a selling point in its effort to sell century contracts, that selling point is one that it is within the power of competitors to diminish or eliminate. The market for the subscriber's dollar is not closed, or "restrained," for a competitor of CMS. The subscriber is under no tie-in agreement to CMS; he is free to shop around and to purchase whichever contract he finds best for him.

The second of the other two markets which might be affected by the all-or-none policy is the market for the patient's dollar. The claim of the plaintiffs is that the CMS all-or-none policy restrains the trade of nonparticipating physicians because it puts nonparticipating physicians under a competitive disadvantage. The claim here is that subscribers prefer to go to participating physicians. The evidence

as to this claim has to be hypothetical and speculative. But even if we assume that this claim has been proved, there is no claim that the economic disadvantage of the nonparticipating physicians is attributable to any conspiracy, between CMS and the participating physicians, to deny to a nonparticipating physician the opportunity of becoming a participating physician, and no claim that CMS has done anything designed to limit the number of participating physicians. Indeed, the plaintiffs claim that CMS has been too vigorous in its efforts to increase the number of participating physicians.

The evidence disclosed that the reason physicians refuse to become century contract participating physicians is that they are unwilling to pay the price that CMS is asking for the century contract participation agreement. That price is that the physician agrees to accept the fees payable under the fee schedule in the century contract in full payment for the corresponding services rendered. The testimony was conclusive that the individual physicians would be willing to sign participation agreements for the century contract if it included provisions for the "usual and customary fee" instead of the fee fixed in the contract. There was no claim, however, in either the complaint or the evidence, that the fees fixed in the fee schedule are unreasonable. There was testimony that where the fees in the schedule differ from the "usual and customary fees," the differences are "slight." Further, the fees fixed in the fee schedule have been approved by the insurance commissioner pursuant to his authority, granted by the legislature, to approve the terms of the contracts of medical service corporations. General Statutes § 33-172.

Hence, with respect to any competitive advantage resulting from CMS participation, the evidence establishes that this advantage is offered to all phy-

sicians on the same terms; that these terms include an agreement to accept, as payment in full, fees paid according to a schedule which fixes reasonable fees, approved by a duly authorized governmental agency; and that there is no competitor of CMS offering a competitive advantage on terms more favorable to the physician. On these facts, the all-or-none policy of CMS does not, as a matter of law, constitute a restraint of trade with respect to the market for the patient's dollar.

## IV

The plaintiffs have shown no legal right on which the court may deny the defendant the power to terminate the participation contracts in accordance with the memorandum of October 26, 1971. Thus, it is unnecessary to decide whether the plaintiff medical organizations have "standing" to prosecute the present action.

The application for a temporary injunction is denied.