CAROLYN MURPHY *v.* BRIAN MCNAMARA

SUPERIOR COURT          JUDICIAL DISTRICT OF          FILE NO. 173772
                              NEW HAVEN

Memorandum filed December 5, 1979

*New Haven Legal Assistance Association, Inc.,* for the plaintiff.

*Platt & McCormack,* for the defendant.

BERDON, J. The plaintiff has brought this action for damages and equitable relief based upon a three count complaint wherein the following is alleged: violations of the Connecticut Unfair Trade Practices Act (hereinafter the CUTPA), General Statutes §§ 42-110a et seq.; violations of the unconscionable contracts section of the Uniform Commercial Code, General Statutes § 42a-2-302; and viola-

tions of the usury law, General Statutes § 37-4. Before the court is an application to continue an ex parte temporary injunction issued on September 19, 1979.

The plaintiff is a recipient of welfare and has four minor children ranging in ages from five to sixteen. The defendant is in the business of renting and selling television and stereo sets. The plaintiff saw an advertisement placed by the defendant in a local newspaper offering color television sets and stereos. The advertisement stated, in part, the following: "Why buy when you can rent? Color TV and stereos. *Rent to own!* Use our Rent-to-own rental plan and let TV Rentals deliver either of these models to your home. *We feature* — Never a repair bill — No deposit — No credit needed — No long term obligation — Weekly or monthly rates available — Order by phone — Call today — Watch color TV tonight." As a result of this offer, the plaintiff called the defendant on January 8, 1979. The next day she entered into an agreement with the defendant which purported to provide for a lease of a twenty-five inch Philco console color television set. The agreement provided for weekly payments of $16, and further provided that if the plaintiff paid that sum for seventy-eight successive one-week terms, she would become the owner of the television set. The agreement also contained the following clause: *"Termination by Renter:* Renter, at its option, may at any time terminate this agreement by return of the property to owner in its present condition, fair wear and tear excepted and by payment of all rental payments due through the date of return."

The plaintiff entered into the transaction with the defendant because she was persuaded through the advertisement that she could obtain the ownership and use of the television set without establishing

credit.[1]  Upon delivery of the set, she paid $36 to the defendant which represented $16 for the first week's rent and a $20 delivery charge.  At no time did the defendant advise the plaintiff of the total amount she would be required to pay in order to own the set under the terms of the agreement, which sum amounted to $1268, including the delivery charge.  The retail sale price for the same set was $499.

From the period of January 9, 1979, to July 3, 1979, the plaintiff made payments which totaled $436.  On or about that date she noticed a newspaper article which criticized the lease plan, and she realized the amount she would be required to pay for the television set under the agreement.  She then stopped making payments and consulted an attorney.

Thereafter, the plaintiff received threats by employees of the defendant.  These threats included telephone calls and written communications.[2]  Dur-

---

[1] For the purposes of the CUTPA, statements or acts susceptible to a misleading interpretation concerning consumer matters are to be construed against the merchant advertiser.  *Resort Car Rental System, Inc.* v. *Federal Trade Commission,* 518 F.2d 962, 964 (9th Cir.), cert. denied, *Mackenzie* v. *United States,* 423 U.S. 827; *Murray Space Shoe Corporation* v. *Federal Trade Commission,* 304 F.2d 270, 272 (2d Cir.).

[2] For example, on September 1, 1979, the defendant sent the plaintiff the following letter:

"1. Return television; 2. Pay off balance owed; 3. Face arrest by police.  Be advised:  If return of property is refused, a criminal complaint will be made to the police charging you in violation of: Connecticut Statute 53-129b.  It provides a $500.00 fine or six months in Prison or Both.  Failure to return our property by 9/8/79 will result in immediate legal action against you.  There are no deals to be made.  This is the last warning.  TV Rentals."

On September 17, 1979, the plaintiff found the following notice on her door:

"I was by at 12:00 p.m. to Pick-up Set.  Please call me at 288-7788 immediately.  That's it!  We will soon be in court. 1. Warrant for arrest; 2. Small Claims Court; 3. Sue.  Check it out if you think we are kidding.  Have a good day.  Thank you.  TV Rentals."

ing this period the defendant attempted to take possession of the television set. These practices of the defendant continued until the court issued an ex parte injunction on September 19, 1979. All of the foregoing resulted in the plaintiff's suffering great emotional stress.

## I

### NATURE OF THE TRANSACTION

The plaintiff first argues that the transaction which she entered into with the defendant was not a lease but, in fact, a conditional sale. It is clear that the parties intended a sale, and that intention controls the transaction. "Regardless of what name the parties give to a transaction, the courts, in general, look beyond the form to the substance, and when one who is called a lessee may become the owner of the leased property at the end of a lease term on full payment of the stipulated rent or by the payment of a small additional amount, the transaction is generally held to be a conditional sale, even though it is couched in the terms of a lease." *Tishman Equipment Leasing, Inc.* v. *Levin,* 152 Conn. 23, 28.

The agreement here was not a true lease, but merely a security agreement in disguise to serve the defendant's own purposes. See *In re Leasing Consultants, Inc.,* 486 F.2d 367, 372 (2d Cir.). This interpretation of the agreement is further fortified when the agreement is read in the context of the Uniform Commercial Code. General Statutes § 42a-1-201 (37), defining a "security interest," provides in part the following: "Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the

lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security." See *Granite Equipment Leasing Corporation* v. *Acme Pump Co.,* 165 Conn. 364, 368. It is clear, therefore, that the agreement and transaction between the parties was in fact a conditional sale.[3]

## II

### UNFAIR TRADE PRACTICES

In 1973, the Connecticut legislature adopted the CUTPA, General Statutes §§ 42-110a et seq. It provides in part that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." General Statutes § 42-110b (a). It is obvious that the legislature intended to make the act at least coextensive with its federal counterpart. Section 42-110b of the General Statutes provides in part the following: "It is the intent of the legislature that in construing subsection (a) of this section, the commissioner and the courts of this state should be guided by interpretations given by the Federal Trade Commission and the federal courts to § 5 (a) (1) of the Federal Trade Commission Act (15 U.S.C. 45 [a] [1]), as from time to time amended."[4]

---

[3] See note 8, infra.

[4] The 1976 amendments, however, were clearly the most significant in making the CUTPA a powerful weapon for both private litigants and the state in combatting unfair and deceptive practices and unfair methods of competition. First, the requirement was eliminated that, absent a substantive regulation by the commissioner of consumer protection, an act, practice or method must have been previously determined to be violative of the FTCA (the Federal Trade Commission Act) in order to be a violation of the CUTPA. Instead, the General Assembly provided that in determining what is an unfair or deceptive act or practice or method of competition,

The legislature further directed that the CUTPA "be remedial and be so construed." General Statutes § 42-110b (d). The act therefore must "be liberally construed." See *United Aircraft Corporation* v. *Fusari,* 163 Conn. 401, 410. It is obvious that the legislature has perspicuously mandated the court to put muscle into this remedial legislation in order to protect the consuming public from unfair and deceptive trade practices. Protection is afforded not only to the consumer, but also to merchants engaged in legitimate business practices, because the act eradicates unfairness and deception employed by unscrupulous competitors.

The unfair trade practices condemned by § 42-110b are not confined to those that were illegal at common law or prohibited by statute (although in these latter situations, the public policy standards are clearly set for the court to act upon). *Federal Trade Commission* v. *Colgate-Palmolive Co.,* 380 U.S. 374, 380; see *Federal Trade Commission* v. *Sperry & Hutchinson Co.,* 405 U.S. 233, 244. Indeed, it has been held that conduct which is legally proper may be prohibited if it is unfair to the public. *Spiegel, Inc.* v. *Federal Trade Commission,* 540 F.2d 287, 292 (7th Cir.). The legislature "advisedly left the concept flexible to be defined with particularity by the myriad of cases from the field of business." *Federal Trade Commission* v. *Motion Picture Advertising Service Co.,* 344 U.S. 392, 394. " '[T]he meaning and application of . . . [the act] must be arrived at by what this Court elsewhere has called

the commissioner of consumer protection and the courts shall be guided by the interpretations given by the FTC (the federal trade commission) and the federal courts to the FTCA. The substitution of the words "guided by" for the original words "determined to be" indicates that the Connecticut courts are now free to find methods, acts or practices not heretofore specifically declared unlawful by the FTC or the federal courts to be prohibited by the CUTPA. See Ormstedt & Langer, "The Connecticut Unfair Trade Practices Act," 52 Conn. B.J. 116, 118–19.

"the gradual process of judicial inclusion and exclusion." ' " *Federal Trade Commission* v. *R. F. Keppel & Bros., Inc.,* 291 U.S. 304, 312.

Applying these standards can be difficult. The United States Supreme Court has referred to some guidelines which are helpful in making a determination of what constitutes an unfair trade practice. " '(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).' " *Federal Trade Commission* v. *Sperry & Hutchinson Co.,* supra, 244–45 n.5; *Spiegel, Inc.* v. *Federal Trade Commission,* supra, 293 n.8; *Covenant Radio Corporation* v. *Ten Eighty Corporation,* 35 Conn. Sup. 1, 9; annot., "Practices Forbidden by State Deceptive Trade Practice and Consumer Protection Acts," 89 A.L.R. 3d 449.

In the present case, the plaintiff relies on the unconscionable bargain extracted by the defendant in requiring her to pay over two and one-half times the regular retail sales price of the television set for the extension of credit, the failure to advise her of the true purchase price she would pay over the eighteen month period, and the unscrupulous collection practice of threatening her with arrest. This court has no doubt that these practices offend the CUTPA and come within its proscriptions.

In evaluating the claim that the bargain was unconscionable, the impact upon the plaintiff must be considered. The plaintiff, a welfare recipient,

was lured to the defendant because of the representations that no credit was needed and that she would eventually own the television set. Clearly, the plaintiff did not have equal bargaining power with the defendant; the plaintiff was at a disadvantage because her economic circumstances required an extension of credit in order to make the purchase. Furthermore, no attempt was made to advise her that she would be paying $1,268 for a television set that sold at retail for $499.

Through the CUTPA, protection must be given to those who do not have the economic sophistication or the awareness possessed by others who may be less concerned about credit; the act must be applied to protect the unthinking, the unsuspecting and the credulous as well as the sophisticated. *Exposition Press, Inc.* v. *Federal Trade Commission,* 295 F.2d 869, 872 (2d Cir.), cert. denied, 370 U.S. 917; *Progress Tailoring Co.* v. *Federal Trade Commission,* 153 F.2d 103, 105 (7th Cir.); *Aronberg* v. *Federal Trade Commission,* 132 F.2d 165, 167 (7th Cir.). "In evaluating the tendency of advertising to deceive, . . . [the court] is bound to protect the public in general, the unsuspecting as well as the skeptical." *Doherty, Clifford, Steers & Shenfield, Inc.* v. *Federal Trade Commission,* 392 F.2d 921, 926 (6th Cir.). The rule of caveat emptor has lost its dominance in today's merchant-consumer relationship. *Federal Trade Commission* v. *Standard Education Society,* 302 U.S. 112, 116.

The federal trade commission has held that the representation of "easy credit" to a consumer with unequal bargaining power and the charging of an unconscionable price for the item constitute an unfair trade practice. *In re Leon A. Tashof d/b/a New York Jewelry Co.,* 74 F.T.C. 1361, 1407, aff'd, *Tashof* v. *Federal Trade Commission,* 437 F.2d 707, 712–13. In fact, the commission went further in its

dicta when it stated: "And we have no doubt that the use of unconscionable selling prices can, by itself, constitute an 'unfair' or 'deceptive' practice, or an 'unfair method of competition' in violation of Section 5 of the Federal Trade Commission Act." *In re Leon A. Tashof d/b/a New York Jewelry Co.,* supra, 1406.

This unfair trade practice has its roots in the common law wherein the court refused to enforce oppressive terms of a contract. *Hume* v. *United States,* 132 U.S. 406, 414; *Scott* v. *United States,* 79 U.S. (12 Wall.) 443, 445; annot., "Unconscionability," 18 A.L.R.3d 1305, 1307. In recent years, the unconscionability doctrine has been applied to protect those who are unable to protect themselves and to prevent injustice. *Seabrook* v. *Commuter Housing Co.,* 72 Misc. 2d 6 (N.Y.). "An exception to this general rule [that no matter how hard the bargain, a court will uphold the validity of a contract without evidence of fraud or deceit] has been developed in instances in which a bargain is so one-sided or unreasonable as to be unconscionable under the circumstances existing at the time of the making of the contract. This doctrine has usually been applied in litigation involving poor persons or otherwise disadvantaged victims of sharp practices. The courts are generally not receptive to pleas of unconscionability by one merchant to another." *Blake* v. *Biscardi,* 62 App. Div. 2d 975, 976 (N.Y.).

In addition, the contract of the parties in the present case is violative of the public policy of the state[5] and therefore constitutes an unfair trade

[5] "The public policy of the Government is to be found in its statutes, and when they have not directly spoken, then in the decisions of the courts . . . ; but when the lawmaking power speaks upon a particular subject, over which it has constitutional power to legislate, public policy in such a case is what the statute enacts." *United States* v. *Trans-Missouri Freight Assn.,* 166 U.S. 290, 340; *Tileston* v. *Ullman,* 129 Conn. 84, 93–94.

practice within the meaning of the CUTPA. That public policy is expressed in the unconscionability clause of the Uniform Commercial Code, General Statutes § 42a-2-302, which provides as follows: "(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result. (2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination."

An excessive price charged a consumer with unequal bargaining power can constitute a violation of General Statutes § 42a-2-302.[6] In the case of *Jones* v. *Star Credit Corporation,* 59 Misc. 2d 189 (N.Y.) the plaintiffs, welfare recipients, purchased a home freezer unit for $900. The freezer had a retail value of approximately $300. The court held that the contract was unconscionable under § 2-302

---

[6] Comment 1 to § 2-302 of the Uniform Commercial Code provides in part the following: "This section is intended to make it possible for the courts to police explicitly against the contracts or clauses which they find to be unconscionable. In the past such policing has been accomplished by adverse construction of language, by manipulation of the rules of offer and acceptance or by determinations that the clause is contrary to public policy or to the dominant purpose of the contract. This section is intended to allow the court to pass directly on the unconscionability of the contract or particular clause therein and to make a conclusion of law as to its unconscionability. The basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract."

of the Uniform Commercial Code and reformed the contract by excusing further payments over the $600 already paid by the plaintiffs.

The failure of the defendant merchant to advise the plaintiff of the total price she would be required to pay under the terms of the contract further compounded the unfairness of his trade practices. The public policy of this state is found in the Truth-In-Lending Act, chapter 657 of the General Statutes, §§ 36-393—36-417. The act requires that the full purchase price and other financial information be disclosed to the purchaser, without consideration of the economic bargaining power of the purchaser. General Statutes § 36-405. Under the circumstances of this case the defendant-merchant was clearly obligated to explain to the plaintiff-consumer the total amount of payments she was required to make before title to the television set was transferred under the terms of the so-called "rent to own" plan.[7]

In sum, an agreement for the sale of consumer goods entered into with a consumer having unequal bargaining power, which agreement calls for an unconscionable purchase price, constitutes an unfair trade practice under the CUTPA.[8] By unequal bargaining power, the court means that at the time the contract was made there was such an inequality of bargaining power (for example, because of the con-

[7] The failure to disclose would have equal application if the transaction was in fact a true lease.

[8] Even if the court were to conclude that the agreement entered into by the plaintiff and the defendant was a true lease, the transaction would still constitute an unfair trade practice. Leases come within the provisions of the CUTPA. General Statutes § 42-110a (4). Furthermore, a lease is also within the purview of the Uniform Commercial Code; it is a "transaction in goods." *Hertz Commercial Leasing Corporation* v. *Transportation Credit Clearing House, Inc.,* 59 Misc. 2d 226, rev'd on other grounds, 64 Misc. 2d 910 (N.Y.). Section 2-302 of the Uniform Commercial Code has been applied to leases. *Fairfield Lease Corporation* v. *Pratt,* 6 Conn. Cir. Ct. 537. It is clear that an unconscionable rental would constitute an unfair trade practice if the lessee had unequal bargaining power.

sumer's need for credit) that the merchant could insist on the inclusion of unconscionable terms in the contract which were not justifiable on the grounds of commercial necessity. The intent of this rule making an unconscionable contract an unfair trade practice "is not to erase the doctrine of freedom of contract, but to make realistic the assumption of the law that the agreement has resulted from real bargaining between parties who had freedom of choice and understanding and ability to negotiate in a meaningful fashion. Viewed in that sense, freedom to contract survives but marketers of consumer goods are brought to an awareness that the restraint of unconscionability is always hovering over their operations and that courts will employ it to balance the interests of the consumer public and those of the sellers." *Kugler* v. *Romain,* 58 N.J. 522, 544. In the present case, the agreement called for an unconscionable price and the plaintiff had unequal bargaining power. Accordingly, the agreement constituted an unfair trade practice under the CUTPA.

## III

### STANDING

The CUTPA differs from the Federal Trade Commission Act. Under the latter, no private right of action exists. *Fulton* v. *Hecht,* 580 F.2d 1243, 1248–49 n.2 (5th Cir.), reh. denied, 585 F.2d 520, cert. denied, 440 U.S. 981. Under federal law the commission is the appropriate body to take action in order to protect the public interests. Under the CUTPA, however, a cause of action was created in favor of the individual. General Statutes § 42-110g (a) provides: "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by such seller or lessor of a method, act or

practice prohibited by section 42-110b, or any person who purchases or leases goods or services or rents or leases property from a seller or lessor primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by such seller or lessor of a method, act or practice prohibited by section 42-110b, may bring an action in the judicial district in which the seller or lessor resides or has his principal place of business or is doing business, to recover actual damages. The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper." To be sure, the legislature not only provided for private enforcement, but also encouraged such action by authorizing class actions, punitive damages and reasonable attorneys' fees "based on the work reasonably performed by an attorney and not on the amount of recovery. . . ." General Statutes § 42-110g (d).

The defendant argues, however, that the plaintiff has failed to meet the requirements of the statute in order to give her standing to bring suit. He claims that the plaintiff has not suffered "any ascertainable loss of money or property." General Statutes § 42-110g (a). The defendant claims that the emotional harm alleged by the plaintiff is not equivalent to an "ascertainable loss of money or property" and will therefore not support a cause of action under the CUTPA. The defendant relies upon the Massachusetts Supreme Court case of *Baldassari* v. *Public Finance Trust,* 369 Mass. 33. The *Baldassari* court, in construing a similar situation, held that damages as a result of "severe emotional distress" did not satisfy the "loss of money

or property, real or personal" requirement of the Massachusetts Unfair Trade Practices Act, Chapter 93A of the Massachusetts General Laws. Id., 46.[9]

There is a substantial difference between *Baldassari* and the present case. In *Baldassari,* the sole injury was the emotional distress caused as a result of unfair collection practices of a debt owed by the plaintiff. In the present case, the unfair trade practice is the unconscionable contract. Under the terms of the contract the plaintiff has already paid to the defendant $436 which would result in a loss to her if the defendant succeeds in repossessing the television through self-help. The plaintiff, however, need not wait until the defendant repossesses the television set. Standing will be satisfied if the

[9] There is an obvious difference between the legislative intents underlying the Massachusetts and Connecticut statutes. "According to the principal draftsman of . . . [the Massachusetts Unfair Trade Practices Act] the 'sole purpose' of the requirement that the plaintiff suffer loss of money or property 'is to guard against vicarious suits by self-constituted private attorneys general when they spot an apparently deceiving advertisement in the newspaper, on television or in a store window.' Rice, New Private Remedies for Consumers: The Amendment of Chapter 93A, 54 Mass. L.Q. 307, 314 (1969). Cf. Nostrand, Treble Damage Actions for Victims of Unfair and Deceptive Trade Practices: A New Approach, 4 New England L. Rev. 171, 174 (1969)." *Baldassari* v. *Public Finance Trust,* 369 Mass. 33, 46. The Connecticut legislature, however, recognized that the commissioner of consumer protection was not adequately staffed to cope with all unfair trade practices and sought to encourage the private sector not only to help themselves but also to protect the public. "The potential uses of the CUTPA for the private litigant are extraordinary. Many causes of action which would fail because of an inability to show common law fraud or misrepresentation may now be acted upon under the CUTPA. The ability of private litigants to act as private attorneys general provides a great opportunity to establish a body of decisional law in Connecticut which will serve to make the CUTPA an effective mechanism through which the consumer and business-person who have been victimized by unfair or deceptive trade practices and unfair methods of competition may achieve redress." 52 Conn. B.J. 116, 129; Remarks of Representative Newman, 16 H. R. Proc., Pt. 14, 1973 Sess., pp. 7321–7323; Remarks of Senator Page, 16 S. Proc., Pt. 8, 1973 Sess., p. 3590.

defendant threatens to execute the contract which is the unfair trade practice, and if he succeeds, an ascertainable loss of money or property will result.[10]

In order to fulfill its remedial purposes, the statute must be construed to give the individual standing to bring suit for an actual or threatened loss. This is made clear by the provision of § 42-110g (d) which allows for attorney's fees in a class action where there is "no monetary recovery, but other relief is granted. . . ."

## IV

### INJUNCTION

For the court to continue the temporary injunction, it must be satisfied that not only is the plaintiff entitled to such equitable relief; *Connecticut State Medical Society* v. *Connecticut Medical Service, Inc.,* 29 Conn. Sup. 474, 477; but also that if it is not granted there will be irreparable harm. *Martino* v. *L. D. DeFelice & Son, Inc.,* 16 Conn. Sup. 18, 19. In making this determination the court may take into consideration the effect the granting or denial of the injunction will have on the parties. "In deciding whether it should be granted or, if granted, whether it should be continued or dissolved, the court is called upon to balance the results which may be caused to one party or the other, and if it appears that to deny or dissolve it may result in great harm to the plaintiff and little to the defendant, the court may well exercise its discretion in favor of granting or continuing it, unless indeed, it is very clear that the plaintiff is

---

[10] The legislative history of the CUTPA is instructive on this point. Representative Ferrari stated the following: "Both the Federal Trade Commission Act and the Connecticut Unfair Trade Practices Act is [sic] the creation of a remedial statute designed to deter deception on [sic] its incipiency." 19 H. R. Proc., Pt. 6, 1976 Sess., pp. 2186–2187.

without legal right." *Olcott* v. *Pendleton,* 128 Conn. 292, 295. It is clear that the plaintiff in this case has met the test.

The nature of the injunction is to a large extent dependent upon the eventual remedy available to the court. The specific grant of equitable powers demonstrates the legislature's intent to give the court wide discretion in determining the type of order necessary to remedy the unfair trade practice. See *Federal Trade Commission* v. *Colgate-Palmolive Co.,* 380 U.S. 374, 392; *Adolph Coors Co.* v. *Federal Trade Commission,* 497 F.2d 1178, 1189 (10th Cir.), cert. denied, 419 U.S. 1105.

In the present case the plaintiff has paid to the defendant over 80 percent of the retail selling price of the television. She should not be required to give up the property. On the other hand, the defendant does not forfeit all of his rights just because he has committed an unfair trade practice. It may be that he will concede that the plaintiff is the owner of the television set and seek to recover the difference between its reasonable value and the amount paid by the plaintiff; or he may wish to litigate the issue of ownership. He should be allowed to do so by way of counterclaim in this action or by the institution of an independent action. He should not, however, be allowed to take possession of the television set through self-help. If he does seek such affirmative relief and a prejudgment remedy, he should be required to disclose a copy of this memorandum of decision to the judicial authority.

Under no circumstances should the defendant be allowed to initiate a criminal complaint against the plaintiff under the provisions of § 53-129b of the General Statutes. This statute applies only to true leases and rentals. Although criminal prosecutions

should not generally be enjoined, equity may do so where enforcement of the law will invade property rights or cause irreparable injury. "[O]rdinarily equity will not enjoin the enforcement of a prosecution under a criminal statute or ordinance, but . . . there is a well-recognized exception to the rule where enforcement of the law will invade property rights or cause irreparable injury; and . . . [there is] no principle which would restrict equity in affording relief under such circumstances to one who would be subject to prosecution under the law or ordinance." *Darien* v. *Stamford,* 135 Conn. 71, 77–78.

Finally, now that this matter is in the court for determination and the plaintiff is represented by counsel, collection attempts directed to the plaintiff individually could only be for the purpose of harassment. Therefore, the order of this court should also cover these activities.

In sum, the ex parte injunction against the defendant is modified and shall continue in force from this date until further order of the court (without bond) as follows:

(a) The defendant is enjoined from attempting to gain possession of the television set through self-help. If the defendant seeks a prejudgment remedy pertaining to the television set which is the subject matter of this suit, he shall disclose to the judicial authority a copy of this memorandum of decision; and

(b) The defendant is enjoined from threatening the plaintiff or initiating a criminal complaint against the plaintiff based upon section 53-129b of the General Statutes regarding the television set which is the subject matter of this suit.

Counsel for the plaintiff shall prepare a formal order setting forth the terms of the temporary injunction, submit the same to counsel for the defendant for his approval (as to form) and then to the court.