[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This case came before the court on an order to show cause why a temporary injunction should not issue. See Wildowsky v. Dudek,30 Conn. Sup. 288, 310 A.2d 766 (1972). A hearing having been held, the court finds the following facts for purposes of the plaintiff's application for a temporary injunction.
 I
The plaintiff, Environmental Products Corporation (Envipco) and the defendant Tomra North America (Tomra) are the sole competitors in a two-company industry, the reverse vending machine industry. In certain states, including this forum, such machines are familiar to the public. They function when a person inserts a certain kind of bottle or can into the machine. The machine then issues money or a credit slip which may be exchanged for money at the facility to which the machine has been leased. Both the plaintiff and Tomra generally operate in the nine states which have traditional "bottle" return laws. In the northeastern portion of the United States, these states include Connecticut,[1] New York, Massachusetts, Vermont and Maine. Other states with such laws include Michigan, Oregon and California. No eastern state south of New York has such a law. Both the plaintiff and Tomra generally share the same customers: large supermarket chain stores. The machines are leased to a retailer. Most business, and most of the CT Page 5265 bottle laws, are in the northeast.
The plaintiff is a Delaware corporation with a principal place of business in Fairfax, Virginia. It has a plant at which it assembles its machines in Naugatuck, Connecticut. It has similar plants in Flint, Michigan and in Riverside, California.
Tomra is a Norwegian company. It is a "support organization", according to its president, which has various "profit centers", in the nature of divisions or subsidiaries, in various parts of the United States.
The defendant Robert Lincoln joined the plaintiff Envipco in May 1987 as its New York Salesman. He was later promoted to vice president for sales and marketing and then promoted to senior vice president. For several years he was the plaintiff's "face" in the northeast. On September 29, 1988, Lincoln signed an "Employee Nondisclosure Agreement", the terms of which are not applicable here. Lincoln became familiar with all of the plaintiff's northeast customers on a personal basis. He was involved in the plaintiff's marketing strategy, familiar with its research and development initiatives, aware of its price structure, knowledgeable about how the plaintiff's machines worked and how they could be cheated. In 1993, his annual salary was $135,000 with a potential for a bonus as high as $50,000. He was one of the plaintiff's most highly paid, if not the most highly paid, employee. On December 29, 1993, Lincoln signed the confidentiality agreement at issue here. That agreement, which superseded the 1988 agreement, was a standard agreement for all employees. It was drafted by the plaintiff, although the employee was left to choose the jurisdiction whose laws would govern the contract. Lincoln, who lived in the Georgetown section of Washington, D.C. and who worked at the plaintiff's corporate offices in Fairfax where he signed the agreement, chose Virginia as the state whose laws would govern the contract.
Before March of 1992, Lincoln worked for the plaintiff in New York, although he had an office in Fairfax, Virginia. Other executives of Envipco wanted Lincoln to work out of Fairfax so that he could be involved in strategic planning. Lincoln acceded. Mike Lavin, who had been forced to sign the same confidentiality contract that Lincoln signed in December 1992, assumed Lincoln's responsibilities in the northeast market.
In March 1994, the plaintiff was urging Lincoln to seek a graduate degree in business administration so that he would, in the wording of an agreement entered into between the plaintiff and Lincoln, "be a more CT Page 5266 valuable executive after such training is completed." Lincoln, too, was eager to obtain an MBA. That agreement further provided that Envipco "acknowledges Bob Lincoln's right to attend the graduate school of his choice, but management believes that the interests of the Company would be best served if he were to remain in the Washington, D.C. area where he would be able to function as part of the management team. Therefore, if Bob Lincoln chooses to relocate his family outside of the D.C. area, he must do so at his own expense."
Lincoln studied for the graduate entrance examination. Subsequently, he was admitted to Columbia University's Executive MBA Program in New York City. That program required that the student's sponsoring employer or organization continue to pay him his full salary while he was engaged in the program. Envipco agreed and Lincoln relocated his family to New York City. He agreed to give up any claim to bonuses while at Columbia, where his education would cost Envipco $80,000.00.
In early 1995, Envipco's Board of Directors met in Fairfax, Virginia and deposed the president and chief executive officer of the company. Dale Everett was installed as the new president and CEO. With Lincoln out of state, Everett stormed through the plaintiff's offices rhetorically asking why he needed to pay Lavin as well as Lincoln such high salaries. These events were communicated to Lincoln by a friend and executive, Charles Rigby. In early 1995, Lincoln met with Everett, who was very hostile. Everett informed Lincoln that (1) Lavin was going to be fired, (2) Lincoln would have to take a pay cut, (3) Lincoln could not go to graduate school, and (4) Lincoln would not be president of the northeast region.
In March 1995, Lincoln, who at all times was an employee at will, told Everett he was resigning and going to work for Toma. Everett told Lincoln he would not try to stop him.[2]
At Toma, Lincoln's responsibility is to develop toma's [Toma's] business over the entire United States. In this capacity, he has met with representative of Envipco's and Toma's mutual customers, in Massachusetts and Michigan, both alone and with another Toma employee. These meetings have not been within a 100 mile radius of Envipco's Naugatuck plant. However, Lincoln plans to call on customers within a radius of 100 miles from Naugatuck. Lincoln's primary responsibility is pursuing strategic matters, focusing outside of the Northeast.
II
CT Page 5267
The plaintiff seeks a temporary injunction, enjoining Lincoln from working for Toma within a 100 radius of the plaintiff's Naugatuck plant and from disclosing confidential or trade secret information and documents to Toma. There is little appellate case law in Connecticut on the criteria for the granting or denial of an application for a temporary injunction. In Olcott v. Pendleton, 128 Conn. 292,22 A.2d 633 (1941), the court stated: "The principal purpose of such an injunction is to preserve the status quo until the rights of the parties can be finally determined after a hearing on the merits. Demingv. Bradstreet, 85 Conn. 650, 659, 84 A. 116. In deciding whether it should be granted or, if granted, whether it should be continued or dissolved, the court is called upon to balance the results which may be caused to one party or the other, and if it appears that to deny or dissolve it may result in great harm to the plaintiff and little to the defendant, the court may well exercise its discretion in favor of granting or continuing it, unless indeed, it is very clear that the plaintiff is without legal right." Id., 293. Our Supreme Court also has remarked that "[t]his criterion necessarily requires consideration of the probable outcome of the litigation. Decisions of our trial courts have frequently referred to the burden of an applicant to show reasonable degree of probability of success before a temporary injunction to preserve the status quo may be granted. Connecticut StateMedical Society v. Connecticut Medical Service, Inc., 29 Conn. Sup. 474,477-78, 293 A.2d 794 (1971); Hopkins v. Hamden Board of Education,29 Conn. Sup. 397, 417, 289 A.2d 914 (1971); Torrington Drive-InCorporation v. I.A.T.S.E.M.P.M.O. Local 402, A.F.L., 17 Conn. Sup. 416,418 (1951) The need to show an irreparable loss unless the status quo is preserved has also been often mentioned. Covenant Radio Corporationv. Ten Eighty Corporation, 35 Conn. Sup. 1, 3, 390 A.2d 949 (1977);Colchester v. Reduction Associates, Inc., 34 Conn. Sup. 177, 185,382 A.2d 1333 (1977). The cases have also alluded to the harm likely to be sustained by other parties as well as the public from preservation of the status quo. Connecticut Assn. Of Clinical Laboratories v.Connecticut Blue Cross, Inc.[,] 31 Conn. Sup. 110, 121, 324 A.2d 288
(1973); Martino v. L.D. DeFelice Son, Inc., 16 Conn. Sup. 18, 19
(1948)." Griffin Hospital v. Commission on Hospitals Health Care,196 Conn. 451, 457-458, 493 A.2d 229 (1985).
 III
The court finds that:
1. The defendant Lincoln signed an agreement at the behest of the plaintiff for whom he already had been working for several years. CT Page 5268
2. By its terms, the agreement is governed by Virginia law. "Contract clauses which require the application of the laws of other states upon breach or dispute are recognized as proper in Connecticut."Syncsort, Inc. v. Indata Services, 14 Conn. App. 481, 484, 541 A.2d 543, cert. denied, 209 Conn. 804, 548 A.2d 443 (1988). Here, the contract clause is superfluous because the contract was made in Virginia and because Connecticut law provides that "the validity and the construction of a contract are determined by the law of the place where the contract was made. . . ." Enterprise Leasing corporation v. Dixon,1 Conn. App. 496, 499, 472 A.2d 1300 (1984). The law of Virginia, therefore, governs all matters arising out of the agreement which are "substantive" for conflicts of law purposes. Broderick v. McGuire,119 Conn. 83, 101, 174 A. 314 (1934).
3. Prior to the plaintiff having its employees sign the confidentiality agreement, its attorneys advised that legal consideration would have to support the agreement and that such consideration would or could be the employee's year-end bonus. SeeTwohy v. Harris, 194 Va. 69, 72 S.E.2d 329, 325-336 (1952). Lincoln, however, received nothing other than the compensation to which the plaintiff had previously agreed in writing. No consideration other than the plaintiff's continuing to employ Lincoln supports the agreement. Under Virginia law, however, this is sufficient consideration.Paramount Terminte Control Co., Inc. v. Rector, 238 Va. 171, 176,380 S.E.2d 922 (1989).[3] Since, as a matter of law, there is adequate consideration to support the agreement, it is irrelevant that the additional consideration which the plaintiff believed was necessary to support the agreement does not exist.
4. This court applies Virginia law in order to construe the agreement between the parties. Nationwide Mutual Ins Co. v. Cassin,221 Conn. 1, 5-6, 601 A.2d 1030 (1992). Especially in cases involving covenants not to compete entered into after the initial employment has commenced, Virginia courts carefully examine and strictly construe the covenant, since it is in restraint of trade; Alston Studios, Inc. v.Lloyd V. Gress Assocs., 492 F.2d 279, 285 (4th Cir. 1974); Richardsonv. Paxton Co., 203 Va. 790, 127 S.E.2d 113, 117 (1962); and those courts place the burden of proving the validity of the contract on the employer. Linville v. Servisoft of Va., Inc., 211 Va. 53,174 S.E.2d 785, 786-787 (1970).
5. Paragraph 8 of the agreement provides, in relevant part: "Upon leaving Employer, Employee agrees not to compete directly or indirectly with Employer in a business within a 100 mile radius of Employer for a period of two years." "Employer" is identified in paragraph 1 of the CT Page 5269 agreement as the plaintiff, Environmental Products Corporation. There is no authority which has been cited by the parties or located by the court fixing where, under Virginia law, a corporation exists. "When a decision from the highest state court is lacking, we must anticipate how that court would rule on the question presented." J.M. Lynne Co. v.Geraghty, 204 Conn. 361, 368, 528 A.2d 786 (1987). Geographically, the meaning of the term "employer" is ambiguous and therefore will be construed against the plaintiff. The plaintiff is a Delaware corporation. The defendant signed the agreement at the corporate offices of the plaintiff in Fairfax, Virginia. According to the evidence, the only office the defendant had was in Fairfax. Fairfax is where the Board of Directors convened when they ousted the plaintiff's past president and installed Everett. The agreement provided that it would be governed by the law of Virginia. Whether the agreement is strictly construed or reasonably construed, the "employer", in thecontext of paragraph 8 of the agreement, means the principal office of the plaintiff, Fairfax, Virginia. Cf.Lloyd's Executorial Trustees v.City of Lynchburg, 113 Va. 627, 75 S.E. 233, 234 (1912); 18 C.J.S., Corporations, § 107a, b. While the plaintiff's claim as to the meaning of "employer" in paragraph 8 was chameleon-like during the hearing, it presented no authority in support of its least unreasonable position, that "employer" meant any place where the plaintiff had an assembly shop.
6. There is no evidence that Lincoln is competing with the plaintiff within 100 of the plaintiff's Fairfax, Virginia offices. Therefore, Lincoln is not in violation of the covenant not to compete in paragraph 8 of the agreement.
7. Although the defendant Lincoln, since his departure from the plaintiff's employ, has called on the plaintiff's customers on behalf of his new employer, Tomra, the plaintiff has cited no Virginia authority which holds that this is a breach of a common law or statutory duty. "[T]he courts of any State may assume, if a different claim is not made on the trial, that the law of the foreign State is the same as that of the home State." Union New Haven Trust Co. v.Watrous, 109 Conn. 268, 285, 146 A. 727 (1929). Neither at common law nor under the Uniform Trade Secrets Act enacted in Virginia; Va. Stats. (Code 1950) § 59.1-336 et seq.; is the plaintiff's customer list a trade secret. Those customers are the well-known supermarket chain-stores, the locations of which are readily ascertainable. See, e.g.,Town Country House Homes Service, Inc. v. Evans, 150 Conn. 314,320, 189 A.2d 390 (1963)("[W]here the identity of the customers is readily ascertainable through ordinary business channels or through classified business or trade directories, the courts refuse to accord CT Page 5270 the list the protection of a trade secret."). Since the plaintiff does not have a confidential customer list and since an employee has no common law duty to abstain from competition with his employer after the termination of his employment; Republic Sys. Program, Inc. v.Computer Asst., Inc., 322 F. Sup. 619, 628 (D.Conn. 1970), affirmed,440 F.2d 996 (2d Cir. 1971); Holiday Food Co. v. Munroe, 37 Conn. Sup. 546,550, 426 A.2d 814 (App.Sess. 1981); Nesko Corp. v. Fontaine,19 Conn. Sup. 160, 110 A.2d 631 (Cm.Pl. 1955); Lincoln's calling on the plaintiff's customers, who also have been at all times relevant hereto Tomra's customers, cannot be the basis of injunctive relief as a remedy for breach of a common law duty or the Uniform Trade Secrets Act.
9. It is unnecessary for the court to determine whether the defendant Lincoln otherwise possesses confidential information and trade secrets of the plaintiff within the ambit of the agreement or the Uniform Trade Secrets Act, enacted in Virginia. Gach v. Franolich,10 Conn. App. 677, 679, 525 A.2d 527 (1987). Even assuming that he does, there was no evidence that Lincoln has divulged or would divulge any such information or documents to his new employer. Under Connecticut law, whether the Superior Court of the State of Connecticut will grant an injunction is procedural, not substantive, for conflicts of law purposes. New England Fruit Produce Co.v. Hines, 97 Conn. 225, 228,116 A. 243 (1922) (matters affecting the remedy depend on the law of the place where the suit is brought). Connecticut law is clear that "no court of equity should ever grant an injunction merely because of the fears or apprehensions of the party applying for it, for those fears may exist without any substantial reason." Moore v. Serafin, 163 Conn. 1,11, 301 A.2d 238 (1972). Injunctions do not issue to avoid temptation toward some allegedly wrongful conduct nor to soothe the anxieties of the parties. Sierra Club v. Mason, 365 F. Sup. 47, 50
(D.Conn. 1973)(Newman, J.). What was said by another court generations ago is apt here: "If the injunction issues, it means that hereafter no man can work for one and learn his business secrets, and after leaving that employment engage himself to a rival in business, without carrying on his back into that business the injunctive mandate of a court of equity. There is nothing whatsoever in the facts of this case, except opportunity to do wrong and a suspicion in the mind of the rival that wrong will be done." H.B. Wiggins Sons' Co. v. Cott-A-Lap Co.,
169 F. 150, 152 (D.Conn. 1909). The provision of the Uniform Trade Secrets Act that "[a]ctual or threatened misappropriation may be enjoined"; Va. Stats. (Code 1950) § 59.1-337A; Conn.Gen. Stat. § 35-52 (a); is not to the contrary. "`No statute is to be construed as altering the common la, farther than its words import. It is not to be construed as making any innovation upon the common law which it does not fairly express.'Shaw v. Railroad Co., 101 U.S. 557, 565, 25 L.Ed. 892 [1879]." DennisCT Page 5271v. Shaw, 137 Conn. 450, 452, 78 A.2d 691 (1951).
9. No basis exists for the court to enter a temporary injunction against the defendant Tomra North America.
The plaintiff has not shown a reasonable degree of probability that it will prevail at the trial of the case. The plaintiff's application for a temporary injunction is denied.
BY THE COURT Bruce L. Levin Judge of the Superior Court