[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Presently before the court is the motion of defendant Celavon Corp. ("Celavon") to dissolve a notice of lis pendens filed by the plaintiff on March 24, 1987.
Said motion should be denied, based upon the facts found as stated in the Finding attached to this memorandum.
Section 52-325(a) of the General Statutes permits a plaintiff, in any action intended to affect real property, to record on the appropriate land records a notice of lis pendens.
As used in 52-325, actions "intended to affect real property" means "(1) actions whose object is to determine the title or rights of the parties in, to, under or over some CT Page 3094 particular real property; (2) actions whose object and purpose is to establish or enforce previously acquired interests in real property; (3) actions which may affect in any manner the title to or interest in real property, notwithstanding the main purpose of the action may be other than to affect the title of such real property." 52-525 (b) of the General Statutes."From the face of the statute it is clear that a notice of lis pendens is appropriate only where the pending action will in some way, either directly or indirectly, affect the title to or an interest in the real property itself. . . ." An action seeking only money damages, even if it involves a land transaction, will not support a notice of lis pendens. Garcia v. Brooks Street Associates, 209 Conn. 15,22.
General Statutes 52-325a permits the property owner to move to discharge the notice of lis pendens. At the hearing on the defendant's motion to discharge, the plaintiff must "establish that there is probable cause to sustain the validity of his claim." 52-325b(a) of the General Statutes. "A probable cause hearing is not intended to be a trial on the merits, nor does it require the plaintiffs to establish their claims by a preponderance of the evidence. McCahill v. Town Country Associates, Ltd., 185 Conn. 37, 39 (1981). `The task of the trial court is essentially one of weighing probabilities; that task requires the exercise of broad discretion. The court, in making its determination of probable cause, does so on the basis of the facts before it.' Id." Williams v. Bartlett, 189 Conn. 471, 483. "Probable cause is the knowledge of facts sufficient to justify a reasonable person in the belief that there are reasonable grounds for prosecuting an action." Vandersluis v. Weil, 176 Conn. 353,356; the ". . . legal idea of probable cause is a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it." Wall v. Toomey, 52 Conn. 35, 36; also Solomon v. Aberman, 196 Conn. 359,363, 52-278a, et seq. of the General Statutes.
A plaintiff will be entitled to relief under CUTPA ". . . upon showing that the defendant engaged in a deceptive or unfair practice and that the plaintiff suffered an ascertainable loss of money or property thereby. General Statutes 42-110b(a), 42-110g(a)." Sportsmen's Boating Corp. v. Hensley, 192 Conn. 747,755. In determining whether a practice violates CUTPA, the court should consider: "(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous: (3) whether it causes substantial CT Page 3095 injury to consumers, competitors, or other businessmen." Daddona v. Liberty Mobile Home Sales, Inc., 209 Conn. 243, 254; see also Sportsmen's Boating Corp., 192 Conn. at 756. It is not necessary that all three criteria to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because of the degree to which it meets all three." Atlantic Richfield Co. v. Canaan Oil Co., 202 Conn. 234, 242.
Upon the facts found there is probable cause to believe that Conrail and Celavon has each acted in violation of CUTPA. Conrail made representations as to the bidding process to be followed and it violated those representations by disclosing plaintiff's bid, extending the bidding closure dates, requiring rebidding, providing short notice for rebidding, and not dealing with each bidder equally. Celavon repeated and initiated groundless statements of plaintiff's financial ability to buy the property, threatened Conrail with litigation, fashioned a bid to learn plaintiff's bid, and acted with Conrail to violate the bidding process.
General Statutes 42-110g authorizes the court to award actual and punitive damages and to "provide such equitable relief as it deems necessary or proper." Equitable relief is available if the court finds that "a clear right has been invaded, and that redress can be secured by putting the parties back in their original position." Hinchliffe v. American Motors Corp.,184 Conn. 607, 618; Murphy v. McNamara, 36 Conn. Sup. 183, 198. Equitable relief includes rescission, setting aside conveyances and passing title, if warranted. Such remedies support the notice of lis pendens.
Accordingly, the motion to dissolve the notice of lis pendens filed by plaintiff on March 24, 1987, is denied.
RONALD J. FRACASSE, JUDGE
FINDING
1. The plaintiff, Superior Landfill Management Company, Inc. ("Superior"), is a Connecticut corporation with its principal place of business in Branford, Connecticut.
2. As of August, 1986 through the date of this hearing, Superior's business was the operation and management of landfill and disposal sites.
3. The defendant, Consolidated Rail Corporation ("Conrail"), is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania. CT Page 3096
4. In 1986, Conrail was the owner of a certain parcel of land consisting of approximately 100 acres located in the Town of North Haven and City of New Haven, Connecticut ("the property").
5. The property, a former railroad yard, was and is known as the Cedar Hill Yard.
6. In early 1986, Conrail was cited by the Connecticut Department of Environmental Protection ("DEP") with respect to a landfill site on the Cedar Hill Yard. The DEP issued an order to Conrail to close and restore the site. The cost of doing so would have been substantial, so Conrail considered selling the property.
7. The property was appraised by a firm called Norman Benedict and Associates on behalf of Conrail at a value of $4.548 million dollars.
8. Superior was interested in purchasing the property because it was in the landfill business and was interested in expanding its landfill business.
9. The defendant Celavon Corporation ("Celavon") is a Connecticut corporation with its principal place of business in North Haven, Connecticut.
10. Celavon was also interested in purchasing the property, and by the late summer or fall of 1986, Conrail was aware of a competitive situation between Celavon and Superior with respect to the property.
11. Edward V. Sayers, Vice President of Superior, was involved in the events concerning the Cedar Hill Yard transaction beginning in August, 1986.
12. In December, 1986, Superior retained Attorney Richard G. Adams to assist it with respect to the Cedar Hill Yard transaction. Celavon was represented by Attorney Robert B. Cohen with respect to the Cedar Hill Yard transaction.
13. Personnel of Conrail, in ascending order of rank within the company, involved in the Cedar Hill Yard transaction, were:
 a. Robert Tracy, Assistant Manager, Real Estate, Regional Office, Edison, New Jersey, who reported to —
 b. George Scioli, Manager, Real Estate, Regional Office, Edison, New Jersey, who reported to —
CT Page 3097
 c. John Sandefur, Director, Field Services, Philadelphia, who reported to —
 d. John Jaeger, Assistant Vice President of Real Estate, Philadelphia, who reported to —
 e. Michael Sims, Vice President of Information Systems and Administrative Services, who reported to —
 f. L. Stanley Crane, Chairman and Chief Executive Officer.
14. Other personnel of Conrail who performed certain functions with respect to the Cedar Hill Yard Transaction were:
 a. Mrs. Virginia Ebert, Director of Management Services. Mrs. Ebert's role with respect to a Conrail property sale is to oversee the preparation of the documents needed to consummate the transaction. Mrs. Ebert reported to Mr. Jaeger. Prior to May, 1987, a Mr. Frank Flynn reported directly to her.
 b. Frank Flynn, Manager of property transactions. Mr. Flynn's duties were to Review sales and leases being processed for management approval. In so doing, he reviewed documents, including correspondences, agreements of sale, Form RE-503's and Delegations of Authority.
15. In April 1986, Conrail sent a request for proposals to five parties interested in acquiring the property.
16. The requests for proposals were sent from the Regional office by Mr. Tracy.
17. Those requests for proposals contained certain requirements that each of the purchasers had to meet for their proposal to be considered. One such requirement was that the deadline for submission of proposals was May 2, 1986 and another was that the purchaser would agree to be responsible for closure of the dump site on the property. Mr. Scioli and Mr. Tracy, on behalf of Conrail, had the authority to place these requirements on the purchasers.
18. All of the responses to Conrail's April requests for proposals were rejected by Conrail.
19. By letter dated May 16, 1986, Celavon Corporation offered CT Page 3098 to pay the appraised value for the property, $4.5 million.
20. On November 21, 1986, Superior offered to pay $5.210 million for the property. Mr. Sayers hand delivered to Mr. Scioli a Conditional Agreement of Sale ("CAS"), a Conrail form, which was signed on behalf of Superior; a deposit check in the amount of $260,500 and a letter dated November 21, from Mr. Sayers to Mr. Scioli.
21. In the meeting in November, at which the above documents were presented, Mr. Scioli gave specific ground rules to Mr. Sayers. Those ground rules required that all offers from Superior be in writing, on proper forms, with deposit rendered.
22. As of November 21, 1986, Superior had not been told by Conrail who was the competing purchaser. Mr. Tracy and Mr. Scioli, in direct conversations with Mr. Sayers, represented to Mr. Sayers that Conrail would not divulge any information about Superior's competition and neither would they divulge any information about Superior or its offer to Superior's competitor. Mr. Sayers was told by Mr. Scioli and Mr. Tracy that, with respect to the nature or substance of its November 21st bid, everything would be held in strictest confidence and that everyone would have an equal position.
23. Throughout 1986 and 1987, Conrail's real estate department had a rule not to disclose the identity or particularly the price of a competing entity to its competitor and this rule was communicated to its field managers.
24. At some point in December, 1986, Mr. Scioli discussed Superior's $5.21 million offer with his superior, Mr. Sandefur. Mr. Scioli wished to proceed with the Celavon deal, notwithstanding that Superior's offer was $700,000 greater than Celavon's because he had been working with Celavon for a long time and was "too far down the road." Mr. Scioli's superiors, Messrs. Sandefur and Jaeger, felt that the difference in price was too great and that Superior's bid should be considered.
25. Conrail then told Celavon that it had a higher offer on the property than the offer that Celavon had made.
26. When Celavon learned that another entity was being considered by Conrail, Celavon threatened a lawsuit against Conrail in a letter dated December 10, 1986 claiming that Celavon had a binding contract with Conrail to purchase the property.
27. Upon review of the letter by a Mr. Les Towne, who worked for Mr. Sandefur. Mr. Towne commented in a note to Mr. Sandefur. "It appears we may get sued! However, $700,000 difference should CT Page 3099 more than handle the legal costs."
28. Messrs. Scioli, Sandefur and Jaeger decided to have both parties separately come to the regional office in New Jersey, in January, 1987, in order to put both parties on an equal footing with respect to equal bidding for the property. They further decided that both competing entities were going to have to submit the same contract documents and were going to have to submit proposals in a similar manner with confidentiality about the amount of the purchase price being observed. This round of bidding was intended by Conrail to be the final round.
29. On January 16, 1987, a meeting was held in the Conrail real estate office in New Jersey. Mr. Scioli and Mr. Tracy attended, as did Mr. Sayers, Mr. Adams and other principals of Superior as well as a representative of the Connecticut Resource Recovery Agency ("CRRA").
30. Prior to the meeting, Superior's understanding of what was going to occur at the meeting was the signing of an indemnification agreement and an increase in deposit monies to $350,000, but not an increase in the $5.21 million purchase price.
31. At the meeting on January 16, 1987, Mr. Scioli set certain ground rules for the bidding. He reiterated that the bids and bid documents were to be kept completely confidential and said all bids would have to be in writing, accompanied by a $350,000 deposit; and he said that all bids would be forwarded to Philadelphia on January 21, 1987 and that that date was the cutoff date for all proposals.
32. On January 16, 1987 Mr. Scioli, on behalf of Conrail, and Mr. Sayes, on behalf of Superior, signed a CAS with a purchase price of $5.210 million and a Rider to the CAS. Superior also submitted an additional deposit check in the amount of $89,500 to bring its total deposit to $350,000.00.
33. Paragraph 18 of the CAS makes contingent the binding effect of the contract upon approval of Conrail's senior management and communication in writing of such approval.
34. The documents were signed and the check was submitted after Mr. Scioli made his statements regarding confidentiality and in reliance upon those statements.
35. Mr. Scioli also indicated that if Superior's competitor did not meet the bidding requirements, its offer would not be considered at all and that Superior's offer would be immediately communicated for senior management approval. CT Page 3100
36. After the January 16, 1987 meeting, Mr. Tracy, on January 19, 1987, prepared a form called an "RE-503" for the sale of the property to Superior at the $5.21 million price.
37. Following the January 16, 1987 meeting, Mr. Scioli forwarded the contract documents to Mr. Jaeger in Philadelphia and circulated the form 503's. The 503's were circulated but Mr. Sandefur and Mr. Jaeger "sat on" the signed contract documents — i.e. did not forward them for further approval — pending a meeting at which Celavon was to be given a chance to make "one last bid". An RE-503 form is a form circulated by Conrail throughout the company in connection with pending real estate sales. The purpose of circulating this form is to ensure that no department in the railroad has an interest in the property to be sold which is not considered. Although Superior had submitted to Conrail on January 16, 1987 all of the documentation Conrail had required, at some time after said meeting Conrail requested revision be made to said documents.
38. By January 21, 1987, Celavon filed to submit any new bid. By January 21, Celavon's only bid was that of May 16, 1986. At some time Mr. Cohen told Mr. Scioli that there were rumors that Superior did not have the necessary financial resources. On approximately January 24, Mr. Tracy called Mr. Adams and told him that the competitor had raised questions as to Superior's financial ability to close on the property. Conrail had not raised any questions with Superior about Superior's financial ability prior to Mr. Cohen's remarks.
39. Nevertheless, Superior promptly provided financial information to the satisfaction of Conrail.
40. On January 28, 1987, Mr. Tracy and Mr. Scioli met with Attorney Cohen, representing Celavon, in New Jersey.
41. At the meeting, Mr. Cohen asserted that Celavon already had a binding contract with Conrail for the property. On said date, Celavon and Conrail had not signed an agreement, Celavon had not made any deposit payment, and Celavon had not executed any documents required by Conrail for the bid process.
42. When the meeting concluded, Mr. Cohen left without submitting any new offer for the property on behalf of Celavon. Mr. Cohen still insisted that there was a binding agreement and threatened to bring a lawsuit.
43. Mr. Adams called Mr. Tracy on the 24th of February and advised Mr. Tracy that the revised documents from Conrail had not been received. Mr. Adams also requested a meeting in Philadelphia. He also expressed his continuing concern over CT Page 3101 Conrail's maintaining the confidentiality of the bids. The meeting, with Conrail's concurrence, was set in Philadelphia for the 4th of March. Mr. Adams asked, in light of the time sequencing, whether his documents should be delivered to Philadelphia on the 3rd, and was told it was satisfactory to bring the documents for the meeting on the 4th.
44. On February 26, 1987, Celavon had a second meeting with representatives of Conrail in Philadelphia.
45. Present at the meeting on behalf of Conrail were Messrs. Tracy, Sandefur and Jaeger.
46. At this meeting, Celavon presented a bid for the property with the amount of money expressed as
 "The amount of the purchase price shall be an amount FIVE HUNDRED THOUSAND ($500,000) DOLLARS in excess of the highest amount offered by Superior Landfill, Inc., and any document entitled confidential agreement of sale" or similar type document executed by Conrail and/or Superior Landfill, Inc. on any date on or prior to February 26, 1987, but in no event less than FIVE MILLION ($5,000,000.00) DOLLARS.
47. When the bid was presented in that fashion, Mr. Jaeger told representatives of Celavon, "we can't accept a contract written $500,000 more than Superior's bid, the competitor's bid". He did this because there is a rule in the real estate department against accepting bids that are framed in such a fashion. The reason for the rule is that if both people submitted a bid in that fashion, there would be no way to analyze it. Mr. Jaeger told Celavon that its bid was unacceptable in the form written.
48. The Celavon people then said that they needed to know the number to put in and, at that point, Mr. Jaeger said to put in $5,710,000. At that point, he told Celavon the amount of the Superior January 16 bid.
49. At that meeting, Mr. Jaeger agreed to recommend the sale to Celavon for $500,000 more than the sum Superior had offered. He never told Superior he had done that. He made the agreement to recommend because "I felt that I could do pretty much as I pleased in this thing — that this was my property and I could sell it to whom I wished."
50. Superior attended its scheduled meeting in Philadelphia on March 4, 1988. The meeting was attended by Mr. Adams, Mr. Sayers, other representatives of Superior, and, on behalf of CT Page 3102 Conrail, Messrs. Tracy, Scioli, Sandefur and Jaeger.
51. On the morning of the meeting with Superior, Mr. Jaeger wrote a memo to his superior, Mr. Sims, recommending the sale of the property to Celavon. This was done with the knowledge that Superior was coming in that same day for their meeting.
52. At no time before or during the meeting did Mr. Jaeger or any representative of Conrail tell Superior that Mr. Jaeger had already recommended acceptance of the Celavon February 26 bid.
53. At the beginning of the meeting, Mr. Adams went through a list of questions that he had prepared. Mr. Jaeger answered the questions on behalf of Conrail. First, Mr. Sayers asked if the competitor was being required to execute the same documents, and Mr. Jaeger replied "Yes." Second, Mr. Adams asked whether Conrail had revealed Superior's price to its competitor and was assured Conrail had not. The third question was with respect to the confidentiality of the bid to be made on March 4. Mr. Jaeger indicated it would be kept confidential and that both parties would be kept on a "level playing field", with both parties being on an equal basis and neither having a special advantage.
54. Superior caucused during the meeting to determine what, if any, bid to submit. The representations regarding a "level playing field" were made by Mr. Jaeger prior to Superior's caucus.
55. Superior submitted its bid on March 4, 1988 in reliance upon all the representations regarding the rules and equal application of the rules to everyone in the bidding process. At no time at the meeting of March 4, 1987 was Superior told the amount of Celavon's bid.
56. Superior caucused and thereafter made a final decision to bid $7.21 million for the property.
57. In presenting their package, representatives of Superior signed three sets of documents: the CAS, with rider, the personal guarantees and an "agreement." All of these documents are part and parcel of one overall agreement for the sale of real estate.
58. Mr. Jaeger told Superior that it would be informed of a final decision no later than the following Wednesday (3/11/87) because Mr. Crane was in Europe until that time. Mr. Crane returned from Europe on March 6.
59. The proposal was submitted for approval to Mr. Crane on March 4, 1987.
60. After the meeting, Mr. Jaeger sent a memorandum to Mr. CT Page 3103 Sims. The memorandum indicates that he would not withdraw his recommendation to make the sale to Celavon because he had agreed to do so; that he considered both Superior and Celavon "responsible, financially, and otherwise"; and that if Mr. Sims disapproved of his recommendation, he would (a) inform Celavon and (b) prepare a substitute delegation of authority for a conveyance to Superior.
61. Mr. Sims refused to approve the transaction to Celavon in view of the higher bonafide offer by Superior and approved the contract with Superior. Mr. Sims informed Mr. Jaeger of this decision on Friday, March 6, by telephone. Mr. Jaeger received a written note from Mr. Sims rejecting the Celavon proposal on March 10.
62. Mr. Scioli called Mr. Flynn at 10:50 A.M. on March 6 telling him to change an RE-503 form from $5.21 million to $7.21 million.
63. An RE-503, dated March 10, 1987, describing a $7.21 million sale to Superior, was circulated. It was signed by Mr. Scioli, Mr. Flynn and Mrs. Ebert.
64. Mrs. Ebert requested Mr. F. Flynn to prepare a delegation of authority for a deal with Superior.
65. Any offers made to Conrail were subject to approval by Conrail senior management, and only senior management had the authority to enter into a contract to sell the Cedar Hill Yard; this unknown by Superior and Celavon.
66. Contracts for the sale of Conrail property were subject to final approval by a Delegation of Authority from the Chairman of the Board, i.e. Stanley L. Crane.
67. Mr. Crane never signed a delegation of authority approving the offer of January 16, 1987 or the offer of March 4, 1987 made by Superior.
68. Conrail was under "an enormous amount of pressure" to close all real estate transactions prior to early April.
66. On March 10, Mr. Jaeger prepared and signed a letter addressed to Mr. Cohen to inform him that Celavon's bid had been rejected; he read to Mr. Cohen the letter over the telephone.
70. Mr. Cohen sent a letter to Mr. Crane on March 11, 1987 accusing Conrail of leaving information. The letter also demanded that Conrail accept Celavon's $5.7 million offer. CT Page 3104
71. Mr. Jaeger and Mr. Cohen had phone conversations on March 10, March 11 and March 12.
72. On March 12, Mr. Cohen called Mr. Jaeger and suggested another round of bidding to which Jaeger unilaterally and without discussion with Superior agreed.
73. Mr. Jaeger called Mr. Adams at 2:30 P.M. on March 12. Mr. Adams returned the phone call later in the afternoon and in the very first communication between Superior and Conrail since March 4, Mr. Jaeger informed Mr. Adams that there would be another final round of bidding the next afternoon, Friday, March 13, at 3:00 P.M. in Philadelphia.
74. Mr. Jaeger told Mr. Adams that Mr. Cohen had offered over he telephone $100,000 more than anything that Superior was offering. When Mr. Adams asked Mr. Jaeger why the bids were reopened, Mr. Jaeger replied a "squeaky wheel."
75. Mr. Adams protested both the reopening of the bids and the short notice to Superior to Mr. Jaeger; the short notice made it impossible for Superior to make financial arrangements.
76. Mr. Adams called Mr. Jaeger at 8:00 A.M. on Friday, March 13 to reiterate his protest of the reopening of the bidding and to inform him that Superior would be attending the bidding under protest.
77. Representatives of Celavon and Superior met with representatives of Conrail shortly before 3:00 P.M. on Friday in Philadelphia. Superior submitted its letter of protest and, under protest, submitted a bid of $7.525 million. Celavon bid $10.5281 million.
78. Celavon executed the CAS for $10.528 million; said contract was approved by senior management, including Mr. Crane.
79. The closing date was set for Monday, March 30.
80. On March 24, Superior filed this lawsuit and the show cause hearing was set for March 30.
81. The date of the closing was moved up to Friday, March 27 in order to avoid the injunction hearing on Monday, March 30.
82. The closing was held on Friday, March 27 as Conrail conveyed the Cedar Hill Yard to Celavon for $10.5281 million.