## The Connecticut Association of Clinical Laboratories et al. v. Connecticut Blue Cross, Inc., et al.

Superior Court     Fairfield County     File No. 150720
AT Bridgeport

Memorandum filed October 18, 1973

*Zeldes, Needle & Cooper,* of Bridgeport, for the named plaintiff.

*Murtha, Cullina, Richter & Pinney,* of Hartford, for the named defendant.

*Beach & Calder,* of Bristol, for the defendant Bristol Hospital.

LEVINE, J. The plaintiffs in this action, three private medical testing laboratories and an association of private clinical laboratories, all of which are licensed to practice in this state and are hereinafter referred to as "laboratories," have brought suit against Connecticut Blue Cross, Inc., a hospital service corporation as defined in § 33-157 (a) of the General Statutes, and three general service hospitals located in this state.

Blue Cross is a nonprofit-sharing corporation organized for the purpose of establishing, maintaining and operating a plan whereby comprehensive health care, including inpatient and outpatient hospital care provided and billed by an approved hospital, may be provided at the expense of the corporation to its subscribers. Blue Cross contracts with its subscribers to pay for specified medical services performed by hospitals at rates which vary depending on the particular contract purchased. All contracts and the rates thereof are subject to approval of the state insurance commissioner. Blue Cross contracts with general hospitals, including the defendant hospitals, in order to perform its obligations to its subscribers; these contracts provide for acceptance of Blue Cross subscribers as patients, and the hospitals receive payment from Blue Cross for services provided in accordance with a schedule of payments agreed to by Blue Cross and the hospitals. Blue Cross contracts obligate it to pay for, among other specified services, laboratory tests performed by the hospital while the patient is lodged at the hospital as an inpatient. An outpatient who has laboratory tests performed on him at a hospital or a private laboratory is not covered under any contract.

As a result, hospitals receive what are known as "Blue Cross admissions"; subscribers who would not be hospitalized for medical reasons are sent

to the hospitals as inpatients so that they may be covered for the ancillary service of laboratory tests. Blue Cross claims that this results in payment for the hospital room in addition to the laboratory tests and causes additional unwarranted costs. Blue Cross has provided for certain ancillary outpatient treatments in some of its contracts but, as has been pointed out, not for outpatient laboratory tests.

In order to attempt to solve the Blue Cross admissions problem, Blue Cross and the three defendant hospitals entered into an agreement for a pilot, or test, program of sixty days' duration, to begin October 19, 1973. This program would allow outpatients whom any doctor sends to the three defendant hospitals for laboratory tests to be covered by the patients' Blue Cross contract, but would not provide coverage for the same tests at a private laboratory. The purpose of the pilot program is for the hospitals, doctors, and Blue Cross to evaluate all the data produced to see if any money is saved and if the service is well performed. Included in money savings would be a lessening or complete elimination of Blue Cross admissions, and that would include a lessening or elimination of patients who, admitted to the hospitals for medical reasons, require laboratory tests and are kept at the hospital for these tests but otherwise could be discharged.

It is this pilot program with the three defendant hospitals that the plaintiff private laboratories seek to enjoin temporarily and permanently. This court is concerned only with the temporary injunction requested, and the hearing which it held was solely on that aspect.

Under General Statutes § 35-34, which governs actions for injunctive relief under the Connecticut Anti-Trust Act, such proceedings are governed by

"the rules and principles governing the granting of injunctive relief." As to temporary injunctions, it has been stated that no action may be taken unless "it is very clear that the plaintiff is without legal right." *Olcott* v. *Pendleton,* 128 Conn. 292, 295. "The issuance of an injunction is the exercise of an extraordinary power which rests within the sound discretion of the court, and the justiciable interest which entitles one to seek redress in an action for injunctive relief is at least one founded on the imminence of substantial and irreparable injury." *Scoville* v. *Ronalter,* 162 Conn. 67, 74. " 'An injunction is a harsh remedy'; *Leo Foundation* v. *Cabelus,* 151 Conn. 655, 657 . . . ; and when an equitable injunction is the specific relief claimed, it is incumbent upon the party seeking relief to allege facts showing irreparable damage and the lack of an adequate remedy at law." *Stocker* v. *Waterbury,* 154 Conn. 446, 449; *Coyle* v. *Housing Authority,* 151 Conn. 421, 424. "The remedy by injunction is 'summary, peculiar and extraordinary.' An injunction 'ought not to be issued except for the prevention of great and irreparable mischief.' It 'is not *ex debito justiciae* for any injury threatened or done to the estate or rights of a person, but the granting of it must always rest in sound discretion governed by the nature of the case.' " *Hine* v. *Stephens,* 33 Conn. 497, 504. It follows from these cases that the requirements for a temporary injunction are (1) establishing a legal right, which involves a determination of the probability of the plaintiff's succeeding on the merits and that there is no other adequate remedy at law; and (2) the imminence of a substantial and irreparable injury to the plaintiff, considered together with the effect of a temporary injunction on the plaintiff and the defendant. "Where an injury is of such a nature that it cannot be adequately compensated in damages, or cannot

be measured by any pecuniary standard, it is irreparable. 'Whether damages are to be viewed by a court of equity as "irreparable" or not depends more upon the nature of the right which is injuriously affected than upon the pecuniary measure of the loss suffered.'" *New London* v. *Perkins,* 87 Conn. 229, 235; *Robertson* v. *Lewie,* 77 Conn. 345, 346.

The plaintiffs allege in their complaint that the proposed pilot program is a violation of the Connecticut Anti-Trust Act, chapter 624 of the General Statutes, in that it is a primary and secondary boycott of the private laboratories. This chapter was enacted in 1971 as Public Act No. 608, and consequently there is little Connecticut authority with respect to its interpretation. The act is modeled after the federal Sherman Anti-Trust Act, 26 Stat. 209, as amended, 15 U.S.C. §§ 1–7 (1970), and therefore decisions interpreting that act are of aid on the issues considered herein. The section on which the plaintiffs rely is General Statutes § 35-28, which reads in part: "[E]very contract, combination, or conspiracy is unlawful when the same are for the purpose, or have the effect, of: . . . (d) refusing to deal, or coercing, persuading, or inducing third parties to refuse to deal with another person." The plaintiffs' claim is that coverage of outpatient laboratory tests at the three hospitals, only, would persuade or induce Blue Cross subscribers to deal with the hospitals and not with the plaintiffs; that the pilot program of sixty days' duration is therefore a violation of the antitrust chapter which constitutes a secondary boycott; and that it is also a primary boycott in that no such contract or pilot program with the private laboratories has been agreed to. The federal act reads in part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade . . . is declared to

be illegal . . . ." 15 U.S.C. § 1. The Connecticut act is more precise in that it prohibits any contract, combination or conspiracy the effect of which is to induce third parties not to deal. The Connecticut act in effect has codified the federal cases interpreting the Sherman Anti-Trust Act.

The evidence indicates that Blue Cross has 49 percent of the people of Connecticut as subscribers, the remaining portion of the population being covered by governmental programs and commercial insurance companies, with a very small percentage being uninsured. This pilot program could not be made permanent unless the rate for it was agreed to by the thirty-eight private hospitals in Connecticut who contract with Blue Cross, and unless that rate and, in fact, the inclusion of the service in the contract were thereafter approved by the insurance commissioner. Fifty percent of Blue Cross subscribers have the Connecticut Medical Service century contract, which presently provides coverage for outpatient laboratory tests. It is interesting to note that CMS does not cover outpatient hospital laboratory tests. Insurance companies' contracts and government programs also provide coverage for outpatient laboratory tests. The negotiations with the hospitals by Blue Cross for the pilot program were on a voluntary basis, for the hospitals to accept or reject, and the doctors who refer patients for laboratory tests have not been contracted with at all by anyone. It appears that doctors develop habits as to where their patients are referred for the tests, as a result of which they repeat to a great extent such referrals.

The plaintiffs in argument on the temporary injunction limited their claim to one of secondary boycott and claimed a per se violation. "Section 5 [General Statutes § 35-28 (d)] of the Act has no specific counterpart in the federal antitrust laws.

It is a codification of what have come to be known as 'per se' violations of the Sherman Act, notably § 1. Generally recognized as 'per se' violations are price fixing, group boycotts, agreements to divide markets, and tie-in dealings. The 'per se' doctrine in federal antitrust law is the antithesis of the Rule of Reason. Like the Rule of Reason, it had its genesis in . . . [*United States* v. *Addyston Pipe & Steel Co.,* 85 F. 271, aff'd, 175 U.S. 211]. Its basis is perhaps best set forth by Mr. Justice Black in . . . [*Northern Pac. Ry. Co.* v. *United States,* 356 U.S. 1, 5] in 1958 where, after stating that only contracts or combinations which 'unreasonably' restrain competition are prohibited by the Sherman Act, he stated: 'However, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the [. . .] excuse for their use.' He then went on to say: 'This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken.' In essence, the 'per se' doctrine is that if an activity, and such is not limited to just the four hereinabove cited areas, is so blatant in its intent and pernicious in its effect, then a court need not inquire into the reasonableness of the same; and thus the complaining party's task, usually the federal government, is that much easier. Section 5 concerns itself with concerted activity in the areas of: (a) price fixing,

(b) controlling production, (c) territorial allocation, and (d) group boycotts. Under § 5 it is important to note that, since the violation emanates from a 'contract, combination or conspiracy,' there must be a plurality of actors, *and* the activity complained of must be 'for the purpose *or* have the effect of.' Thus there must be an *intent;* or, absent thereof, the activity complained of must have the *effect* of accomplishing one or more of the four proscriptions." Brodigan, "The Connecticut Antitrust Act," 47 Conn. B.J. 12, 24.

Bork, "The Rule of Reason and the Per Se Concept: Price Fixing and Market Division," 75 Yale L.J. 373, 377, states: "Much of the Sherman Act's doctrinal chaos is attributable to judicial and scholarly fondness for impossibly broad statements of the per se rule. The warmth and security that sweeping, absolutist formulations offer is likely to prove here, as in other areas of the law, the forerunner of icy intellectual demise. It is frequently said that any agreement to eliminate competition is per se illegal, but the inescapable fact is that an agreement which eliminates competition is basic to almost every productive unit consisting of more than a single person. The agreement may be spelled out or, more often, may be tacit, but, to the degree that coordination of the productive activities of persons is achieved, actual or potential competition must be eliminated. Holmes's *Northern Securities* dissent [*Northern Securities Co.* v. *United States,* 193 U.S. 197, 400] demonstrated that an all-embracing rule against the elimination of competition would require the atomization of society. Such a rule is inconceivable."

"The elusive term 'secondary boycott' carries two connotations, one factual and the other legal. The factual connotation is one of indirect attack through a third person — the bringing of pressure on one

person in order to exert pressure on another with whom the underlying dispute exists. The legal connotation is one of illegality, for the term is a word of opprobrium to label that which is deemed illegal. The factual and legal connotations are not necessarily coextensive and the double image of the term has blurred analysis. Moreover, inquiry often has been into whether conduct is 'primary' or 'secondary', and this in turn has often seemed to be a search for confusion in a semantic wilderness." Summers & Wellington, Casebook on Labor Law, p. 279.

The plaintiffs rely to a great extent on *United States* v. *General Motors Corporation,* 384 U.S. 127. There General Motors in combination with certain dealers and dealers' associations undertook to eliminate sales at discounts of its automobiles by inducing other dealers to refrain from selling to or through the discounters. "We have here a classic conspiracy in restraint of trade: joint, collaborative action by dealers, the appellee associations, and General Motors to eliminate a class of competitors [automobile discounters] by terminating business dealings between them and a minority of Chevrolet dealers and to deprive franchised dealers of their freedom to deal through discounters if they so choose." Id., 140.

The instant case differs factually from the *General Motors* case. Nowhere does it appear that the agreements with the hospitals were designed to deprive anyone, including the private laboratories, of a subscriber's right to go where he wishes for outpatient tests. The agreement does not deprive subscribers of their freedom to deal with private laboratories, albeit they conceivably might go where coverage exists. The General Motors agreement was designed to prevent the discounters from getting cars. Nothing in the agreements here deprives doctors of the right to send their patients to private

laboratories. What we are concerned with here is a pilot program of sixty days' duration, the primary purpose of which is to evaluate what savings, if any, will occur by reason of its effect on Blue Cross admissions to hospitals. The program is temporary and may never be put into any Blue Cross contract; if it is put into effect, it is speculative that subscribers will purchase the Blue Cross contract containing this ancillary service at the cost or rate which will be entailed to them. The individual subscriber may not be persuaded that the added charge is economically feasible to him, if provision is made in a contract after the pilot plan's evaluation. For an ordinary combination to constitute a group boycott its purpose must be to coerce third parties in order to inhibit competition and the primary purpose of the combination must be to harm competition. Barber, "Refusals to Deal under the Federal Antitrust Laws," 103 U. Pa. L. Rev. 847, 877. Significantly, Blue Cross has competitors, in the state, who insure the ancillary service involved here or who could insure for it. It has not been demonstrated to this court that the agreements with these three hospitals have a pernicious effect on competition and lack redeeming virtue. *Northern Pacific Ry. Co.* v. *United States,* 356 U.S. 1, 5. Two other cases cited by the plaintiffs, *Eastern States Retail Lumber Dealers' Assn.* v. *United States,* 234 U.S. 600, and *Klor's, Inc.* v. *Broadway-Hale Stores, Inc.,* 359 U.S. 207, may be distinguished on their facts since the court in both cases found that the primary, the major, intention of the combination or contract was to eliminate competition. Such a finding cannot be made in the instant case.

"We conclude that resort to the *per se* rule is justified only when the presence of exclusionary or coercive conduct warrants the view that the arrangement in question is a 'naked restraint of trade.'

Absent these factors, the rule of reason must be followed in determining the legality of the arrangement." *E. A. McQuade Tours, Inc.* v. *Consolidated Air Tour Manual Committee,* 467 F.2d 178, 187. The rule of reason has to do with redeeming features which save a restraint from condemnation as a violation. *Worthen Bank & Trust Co.* v. *National BankAmericard Inc.,* 345 F. Sup. 1309, 1319. The significant feature involved in the instant case is a temporary program, whose primary purpose is to evaluate the feasibility and economy of providing the ancillary service of outpatient laboratory tests. Blue Cross is attempting to determine if the lessening or elimination of Blue Cross admissions will reduce its costs and therefore reduce the rates of its contracts with its subscribers and, further, to determine if such a program will make more bed space available at hospitals for those who are ill and require a hospital bed. The plaintiffs have not established by a preponderance of the evidence that a secondary per se boycott has been or would be created.

The plaintiffs claimed that the irreparable injury which they would suffer is a monetary loss which is irreparable since it "is not susceptible of determination to its full extent and is not estimable by an accurate standard but is estimable only by conjecture." *Case* v. *Zeiff,* 10 Conn. Sup. 530, 532. The plaintiffs' evidence clearly establishes that their present records are kept in such detail that the ambulatory patients, who constitute the greatest percentage of their clientele, are divided into uninsured and insured, as are the nonambulatory patients. Certainly the computation of the loss of tests in dollars, if any, can easily be computed for the sixty-day period. One laboratory which keeps no records was able, since the proprietor interviews each patient personally, to estimate that 75 per-

cent of its ambulatory clients were uninsured. Again, even on his analysis of his clientele, it should be a matter of simple computation to ascertain how much of a loss was suffered for the sixty-day period. The harm which it is speculated will result to these plaintiffs, i.e. monetary loss, is susceptible of determination to its full extent for the period of the pilot program.

The court finds that a secondary per se boycott has not been established; that the plaintiffs' probability of succeeding on the merits is without a firm basis; that there is no likelihood of substantial irreparable injury; and that there is an adequate remedy at law by way of a suit for damages, which are computable. The harm to the plaintiffs will not be great since it is monetary and computable, as has been pointed out, and the harm to the defendants would be great since the economic evaluation of the lessening or elimination of Blue Cross admissions would be destroyed.

In view of the preceding findings of the court, it becomes unnecessary to determine whether Blue Cross comes within the rule of *Parker* v. *Brown,* 317 U.S. 341, to the effect that activities which are regulated and supervised by the state to the end that they are the result of the considered judgment of the state regulatory agency are excluded from anti-trust laws.

The application for a temporary injunction is denied.