[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The above-captioned cases come before the court on the plaintiff's application for a prejudgment replevin of certain documents (as to Civil No. 91-0324058) and his application for a temporary injunction to prevent the defendant from denying him access to certain files and business information in the defendant's possession. The two applications were heard together in a hearing that spanned two days. CT Page 10710
The facts are found to be as follows.
The plaintiff, Patrick Culligan, has made his living since 1984 by selling insurance in various capacities with various employers.
In 1988, the plaintiff was working at the Malcolm Insurance Agency in Milford, finding customers and then securing insurance for them through the agency, which was authorized to write insurance for several insurers. The plaintiff was not then and has never become an authorized agent of any insurance company but has been what is termed a "producer" who brings business to such agents. The plaintiff is, however, licensed to write insurance directly with the state's assigned risk pool.
James Erskine worked at the Malcolm Agency at the same time as the plaintiff. Erskine was an agent for at least one insurer and began planning to set up his own agency. This plan came to light and he was fired by the Malcolm Agency, which also fired the plaintiff out of suspicion that he was involved in Erskine's plan. On President's Day 1989, the day the plaintiff was fired, Erskine visited him at home and proposed that the plaintiff join him in his new business venture. Though two proposed drafts of a written agreement as to the arrangement were subsequently drafted, no formal written agreement was ever signed by the parties, and the plaintiff began to work with the defendant on the basis of the oral agreement reached at his home on President's Day 1989.
The parties have differing recollections of the terms of that agreement, however the court finds that their agreement included the following terms:
1. The defendant could not offer the plaintiff a salary or its so agreed to pay him fifty percent of the commissions the agency received from insurers for property and casualty policies he initiated or helped initiate and eighty percent of such commissions on life and health policies.
2. The plaintiff's "book of business", that is, the names of his customers and information helpful to selling them insurance in the future, including the expiration dates of their policies, would be the plaintiff's to keep and would not become the exclusive property of the agency (in contrast to the plaintiff's situation at the Malcolm Agency).
3. If business identified as the plaintiff's account was cancelled, he would owe the defendant his share of any unearned commission paid, and adjustments would be made to reflect such cancellation. CT Page 10711
4. The plaintiff was not required to spend any particular amounts of time at the agency's office, which Erskine set up in his home.
The day after the parties reached the above agreement, the Malcolm Agency offered the plaintiff his salaried job back. The plaintiff refused this offer because he believed that by owning his own book of business he would, over time, be in a better position than if his efforts merely enriched an agency which paid him a fixed salary.
On July 9, 1991, Erskine confronted the plaintiff with his discovery that the plaintiff had been writing business directly with the Connecticut Assigned Risk Pool instead of writing it through the agency so that there would be a fifty-fifty split of resulting commissions. The plaintiff denies that the oral agreement he reached with Erskine included a requirement that he not write any business outside the agency. Erskine testified that such exclusivity was his "expectation" but he did not testify that this expectation was ever made an express part of the parties' agreement. Since Erskine was not paying the plaintiff a salary or benefits, there is no reason to regard an exclusivity agreement as a natural and logical feature of the agreement between the parties, and it appears that there was simply no meeting of the minds as to exclusivity.
The defendant advised the plaintiff on July 9, 1991, that their arrangement was at an end.
The plaintiff claims that he is entitled to his "book of business" in the form of copies of customer records and expiration information to give effect to the agreement that he would have an ownership interest in his efforts whether or not he stayed with Erskine. The plaintiff's "book of business" consists of those clients whose business was brought to the Erskine agency by the plaintiff or who were designated as clients of the plaintiff after joint efforts by the plaintiff and Erskine and as to whom the plaintiff was accorded a portion of the commission in the past.
Except as to customers who have filed formal "broker of record letters" requesting that the insurance company transfer their account from the defendant to the agency with which the plaintiff is now affiliated, the defendant has refused to give any effect to the agreement that the plaintiff would have an ownership interest in his "book of business." The defendant has, however, continued to pay the plaintiff commissions and to adjust for unearned commissions as to accounts previously designated as being the plaintiff's accounts at the defendant agency, and the defendant recognizes an obligation to pay the plaintiff fifty percent of commissions received by the agency as to renewals of CT Page 10712 such business.
The plaintiff is now affiliated with another insurance agency through which he is able to secure insurance for clients.
The defendant has sent out notices to insureds who were the plaintiff's customers (that is, customers as to whom plaintiff was to receive half of the agency's commission) stating that the plaintiff had left the Erskine agency and, by their wording, suggesting that the plaintiff was no longer available to sell them insurance and that Erskine would handle the customers' accounts.
REPLEVIN
The plaintiff's application for a prejudgment remedy seeks replevin of "copies of Patrick Culligan's insurance client files and his `x-date' files [expiration date records] which contain names, addresses, and other relevant information of prospective clients."
The statutory remedy of replevin exists to achieve the return to the rightful owner of goods wrongfully taken or detained by another. 52-523 et seq. C.G.S. Prejudgment replevin is among the prejudgment remedies authorized pursuant to 52-278a et seq. C.G.S., upon a showing of probable cause that the plaintiff will prevail on his claims. International Harvester Credit Corp. v. Gillis, 4 Conn. App. 510, cert. denied, 197 Conn. 808 (1985).
The plaintiff has failed to establish that the documents he seeks to replevy, that is, copies of the records of customers insured through the defendant agency, in fact exist. He does not seek to replevy the actual records, but only copies, a limitation that recognizes the need of the customers for continuous record keeping by a duly authorized agent of the insurance companies that wrote their coverage.
In actuality, the plaintiff seeks an order requiring the defendant to create new property, that is, copies of the insurance records as to those insureds who were designated as his customers before his termination. The relief he seeks is not within the ambit of the replevin statute. Replevin is a purely statutory action, Staub v. Anderson, 152 Conn. 694 (1965), and the court is not free to add to it a requirement to create property to accommodate a limited right of a party, in this case, the plaintiff's right to certain information, though not to the insurance records themselves. The original records cannot be said to be wrongfully detained by the defendant, as that party is the agent actually responsible to the insureds for processing of claims and continuity of coverage. CT Page 10713
The application for a prejudgment replevin is denied for failure to identify the existence of property to which the plaintiff can establish probable cause as to a right to possession and wrongful detention by the defendant.
PRELIMINARY INJUNCTION
The plaintiff seeks a preliminary injunction prohibiting the defendant "from denying plaintiff access to his own client files and x-date files and from engaging in any conduct or communication with plaintiff's clients informing them he voluntarily left James Erskine and Company to pursue his own ventures." (Memorandum of Law in Support of Plaintiff's Application for Temporary Injunction, at page 20).
To obtain preliminary injunctive relief, a plaintiff must show clearly that protectable interests are at stake, that he has a reasonable certainty of success on the merits of the claim, and that unless injunctive relief is granted he will suffer irreparable injury for which he lacks an adequate remedy at law. Berin v. Olson, 183 Conn. 337, 340 (1981); Covenant Radio Corporation v. Ten Eighty Corporation, 35 Conn. Sup. 1, 3 (1977).
The plaintiff identifies as irreparable the injury done to his business reputation, credibility, and career as a seller of insurance if he is prevented from access to the records that will enable him to maintain contacts with his customers. Whether an injury is or is not irreparable "depends more on the nature of the right that is injuriously affected than on the pecuniary measure of its extent or its magnitude. Cummings v. Tripp, 204 Conn. 67,90 (1987); New London v. Perkins, 87 Conn. 229, 235 (1913); Robertson v. Lewie, 77 Conn. 345, 346 (1904); Conn. Ass'n of Clinical Laboratories v. Conn. Blue Cross, Inc., 31 Conn. Sup. 110,114 (1973). The issue is whether a remedy at a later time will repair the damage or whether prevention by injunctive relief is warranted.
Severe difficulty in determining the extent of the loss by way of money damages has been recognized as constituting "irreparability." Conn. Ass'n of Clinical Laboratories, supra, at 120; Case v. Zeiff, 10 Conn. Sup. 530, 532 (1942). While it will certainly be possible to calculate the amount of the plaintiff's share of commissions resulting from the defendant's continued business with those of its insureds that are designated as the plaintiff's customers, such relief would not redress the denial to the plaintiff of his opportunity to enhance his earnings from those accounts by attempting to build upon personal relationships and good will he may have created in the course of soliciting business. Just such an opportunity appears to have been at the root of the plaintiff's decision to forego a salaried job and CT Page 10714 build his own client base through affiliation with the defendant.
The plaintiff credibly testified to the effect that the nature of a salesman's good will with a customer is such that it is adversely affected by the passage of time; clients whose insurance is renewable at regular intervals are likely to develop relationships with new salesmen because of their need to continue to secure insurance, and the plaintiff's ability to capitalize on his past efforts and successes is likely to be lost, either to the defendant or to others. The court finds that the plaintiff has established harm of an irreparable nature.
The plaintiff has also demonstrated a likelihood of success on the merits of his claim of entitlement to retain access to his "book of business." The defendant, through its president, James Erskine, admitted that such access was a feature of the bargain struck when the plaintiff agreed to work for the defendant. The defendant's testimony as to other claimed features of the arrangement appear to the court to be belated attempts to improve the defendant's position in the arrangement after the plaintiff had provided work that helped establish the agency's initial client base.
The defendant has raised no defenses to the enforcement of the oral contract between the parties.
The injuries from which the plaintiff seeks protection are not remediable by eventual money damages but involve a business opportunity that would be extremely difficult to measure. That opportunity, as discussed above, is distinct from the plaintiff's contractual entitlement to a share of commissions received by the defendant agency as to insureds who came to the agency as the plaintiff's customers.
Because of the nature of the commodity at issue, the purchase of insurance, and the fact that the plaintiff is not himself an agent of any insurance provider other than the assigned risk pool, the court is constrained to determine whether any harm would result to third parties from the entry of injunctive relief. The federal standard for the award of temporary injunctive relief requires consideration of harm to third persons in a balancing of the harm to the parties. Basilicato v. International Alliance of Theatrical Stage Employees, 479 F. Sup. 1232, aff'd 628 F.2d 1344
(2d Cir. 1980). In the Superior Court, the comparative harm to the parties and possible harm to third parties are appropriate considerations in the exercise of the court's discretion to grant or deny such preliminary relief. Dukes v. Durante, 192 Conn. 207,224 (1984); Covenant Radio Corp. v. Ten Eighty Corp., 35 Conn. Sup. 1,390 A.2d 949 (1977). The court finds that while the provision of services to the insureds from their present insurer CT Page 10715 requires their files to be maintained by the defendant until such time as an insured requests a transfer to another agency, there is no harm, and potentially a benefit from the increased competition that would result from access by the plaintiff to information concerning their insurance needs.
The plaintiff is entitled to a preliminary injunction prohibiting the defendant from denying him access to the files of insureds who were his clients while he was affiliated with the defendant and the "x-date" files including the names, addresses, and other relevant information as to prospective clients that were identified as such in whole or in part by the plaintiff's efforts.
The plaintiff seeks further relief to prohibit the defendant agency from suggesting to his clients that he voluntarily left the defendant. The plaintiff introduced evidence that his clients have received a letter reporting his departure, however he has offered only speculation as to the effect of that message on the receivers. The evidence indicated that the defendant now supplies the plaintiff's telephone number to those who inquire, and there was no indication that the defendant intends to cease to do so or to engage in further conduct to discourage customers from conferring with the plaintiff. Injunctions are not to be issued merely because of fears or apprehensions of future harm. Moore v. Serafin, 163 Conn. 1 (1972). At any rate, access to his customer's records in adequate to enable the plaintiff to cure any misimpression caused in the past and prevent any further harm.
CONCLUSION
The application for prejudgment replevin of records is denied.
The defendant, its agents and employees are hereby enjoined until further order of the court from denying the plaintiff access to the files of insureds who were designated as his clients while he was affiliated with the defendant. The defendant is further enjoined from denying the plaintiff access to the "x-date" files, including the names, addresses, expiration dates, and other information relevant to future insurance needs of prospective clients identified as such in whole or in part by the efforts of the plaintiff while he was affiliated with the defendant.
BEVERLY J. HODGSON JUDGE OF THE SUPERIOR COURT