[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] RULING ON MOTION FOR TEMPORARY INJUNCTION
Alleging violation of a restrictive covenant not to compete, the plaintiffs sought and received an ex parte temporary injunction restraining the defendant from engaging in certain accounting activities. I granted the ex parte motion on January 29, 2002; the injunctive order was modified by agreement on February 13, 2002. An adversary hearing was held on February 27 and March 1, 2002. The parties filed two rounds of briefs by March 12, 2002. Because this is "high tax season", I am ruling as quickly as is feasible. Although I have carefully reviewed the materials submitted by both sides and have read the authority cited, I will not discuss the issues at great length in this decision in the interest of disseminating the ruling quickly.
The motion for the temporary injunction requests that the defendant Nancy Henderson be ordered not to violate a non-compete agreement and, more particularly, not to operate a general bookkeeping, tax preparation and tax filing business within Bristol or Terryville; be ordered not to retain, use or disclose clients lists, files and other proprietary information; and soliciting former and present customers of the plaintiffs. The injunction currently in effect adopts the request, with the qualification that the prohibition against conducting an accounting and tax preparation business applies only to clients of Hoffnagle Associates.
The salient, though condensed, facts which were adduced at the hearing are as follows. The plaintiff John Hoffnagle has for many years owned and run a tax preparation business, apparently as a sole proprietorship, in Bristol, Connecticut, under the name of "Hoffnagle Associates." The defendant Nancy Henderson, an accountant, began employment with Hoffnagle early in 1995. On January 27, 1996, she and Hoffnagle signed a document entitled "Employee Agreement". The agreement defined some of the rights and obligations of the parties, and it included a "non-compete agreement" in paragraph ten. There is some dispute as to whether the agreement was CT Page 3880 accompanied by any discrete consideration: Hoffnagle claims that a raise was given in consideration for signing the agreement, and Henderson claims that although there was an increase in the hourly compensation rate that began more or less contemporaneously with the execution of the agreement, that increase was coincidental and, in any event, was eliminated after tax season.
Until January, 1997, Henderson worked in the Bristol office of Hoffnagle, which at the time was the only office. In 1997 Hoffnagle opened a branch office in Terryville, Connecticut. The branch office was named "Terryville Tax and Business Center" or "Hoffnagle Associates — Terryville Tax Business Center". In any event, the entire business was owned by Hoffnagle and was run as another branch of the same business. Although apparently a different tax filing number was used by the Terryville branch, apparently this was used because of IRS requirements regarding numbers for separate geographic locations. Henderson staffed the Terryville location from the time that it opened and became the manager, at least in title, of that office.
In the next several years, Hoffnagle changed the structure of his business. He opened, then closed, another branch. More significantly, as he approached retirement he decided formally to separate the businesses of the Hoffnagle enterprise in Bristol from the Terryville branch so that he could sell one or both of the businesses separately. To this end, Hoffnagle arranged for the Terryville "branch" to become a separate business entity owned by ConnTax Corporation, a Chapter S corporation owned by members of Hoffnagle's family.[1] Hoffnagle Associates remained a "d/b/a" owned by Hoffnagle. The defendant Henderson, beginning in January, 2001, was technically an employee of Terryville Tax, apparently a trade name of ConnTax, and received her paychecks from ConnTax. At least as early as 2001, invoices to customers serviced at Terryville Tax were sent on letterhead stating "Terryville Tax and Business Center", apparently without reference to Hoffnagle Associates.
During 2001, Hoffnagle consummated the sale of the original Hoffnagle Associates to a former competitor, Tax Offices of America LLC. The managing partner of Tax Ofices of America, Jeffrey Massicotte, testified that the major factor in the purchase was the client list or the customer base. The sale was closed, apparently, in October, 2001.
Hoffnagle had also discussed selling the Terryville Tax operation: his plan was to retire, but he wanted to provide at least health insurance for himself and his wife. Accordingly, tentative plans to the effect that a partnership consisting of the defendant Henderson and Jessica Gerrick, another employee, would take over the Terryville Tax business over a period of years; the consideration would be no increase in pay for five CT Page 3881 years and the obligation to fund health insurance for the Hoffnagles into the future. Although plans were discussed with an attorney, they were not finalized and the defendant Henderson became disenchanted with the proposal. During 2001, she and Hoffnagle considered a sale of the Terryville Tax business to her, but were unable to agree on a price.
After plans to sell the Terryville Tax business fell through, Henderson left and set up her own business across the street from the Terryville Tax location. Her departure resulted in some confusion over the whereabouts of some files and some information; I need not resolve all of those issues because they are not directly apropos to the immediate issue of what sort of injunction, if any, ought to issue. She divided clients whom she has done business with since her departure into three lists which were presented in court: "personal clients", Terryville Tax clients and new clients. There has been some lack of precision regarding the categorization of some of the clients and some confusion over the status of some of the existing Terryville Tax clients. Again, because we are now dealing in terms of an injunction, not all of the confusion needs to be resolved at this point.
The plaintiffs seek a temporary injunction enforcing the covenant not to compete. The general rule is that a party seeking a temporary injunction needs to show the establishment of a legal right to the requested relief, which involves both the probability of success on the merits and the lack of an adequate remedy at law, as well as the imminence of substantial and irreparable injury to the plaintiffs, all in the context of weighing the benefits and harms to both parties.Connecticut Association of Clinical Laboratories v. Connecticut BlueCross, Inc., 31 Conn. Sup. 110, 113 (1973); Waterbury TeachersAssociation v. Freedom of Information Commission, 230 Conn. 441, 446
(1994); Covenant Radio Corporation v. Ten Eighty Corporation,35 Conn. Sup. 1, 3 (1977). Generally, the principal purpose of a temporary injunction is to preserve the status quo until the parties' rights can be determined at a full hearing. Bridgeport Herald v. LowerFairfield County Newsdealers Association, Inc., 22 Conn. Sup. 111, 116-17
(1960); Olcutt v. Pendleton, 128 Conn. 292, 295 (1941). Factors to be weighed, then, include the probability of success on the merits, irreparability of harm, the impact on each party, and the public good. See Griffin Hospital v. Commission on Hospitals and Health Care,196 Conn. 451, 456-459 (1985). Generally, irreparable harm does not need to be shown in order to enforce a covenant not to compete. Mathis v.Lally, 138 Conn. 51 (1951).
I first turn to the issue of probability of success on the merits. The defendant Henderson has argued and presented evidence tending to show that there was no consideration for the covenant not to compete. It is of CT Page 3882 course true that a covenant not to compete for which there is no consideration is not enforceable. See, e.g., Dick v. Dick, 167 Conn. 210,224 (1974). The evidence in this case shows that the defendant received a significant, though perhaps temporary, pay raise at virtually precisely the time that the employment contract including the covenant not to compete was signed. Although not dispositive, in that the defendant claims that the increase was unrelated, it certainly is circumstantial evidence that the contract is supported by consideration. I find, then, that for the purpose of this decision there is sufficient likelihood of success on the issue of consideration to consider the other issues presented.
The next issue presented by the defendant is the reasonableness of the covenant. Our courts have consistently relied on five factors in determining the reasonableness, and, hence, enforceability, of covenants not to compete. They are: 1) the length of time the employee is barred from competing; 2) the geographical area; 3) the fairness of the protection to the employer; 4) the effect of the restraint upon the employee; and 5) the interference with the public interest. See, e.g.,Robert S. Weiss Associates, Inc. v. Wiederlight, 208 Conn. 525, 529
(1988). If any one factor is unreasonable, the covenant will not be enforced. New Haven Tobacco Co. v. Perrelli, 18 Conn. App. 531 (1989).
The time factor of five years is on the long side of reasonable. Such a period has been upheld by the Supreme Court; see Scott v. General Welding Iron Co., 171 Conn. 132, 140 (1976); but there is no guarantee that a full review on the merits would conclude that a period of five years is reasonably necessary to protect the interests of the employer or is a reasonable restraint of trade consistent with the public interest. For the purpose of analyzing the motion to enforce the restrictive covenant by means of a temporary injunction, however, I do not find the time period necessarily unreasonable, but I do not find that the probability of success on the merits weighs very heavily in favor of the plaintiff
The geographical area, that is, the town in which she worked and a five mile radius therefrom, is clearly reasonable. Except for the time period, the restriction is reasonable with regard to the protection of the employer's legitimate interests, in that the customer list is perhaps the most important asset of the business and, concomitantly, the employer did in this instance take some pains to protect the confidentiality of the customer information. The information is not readily available through other sources. In principle, the covenant does not unreasonably limit the defendant's ability to make a living, especially because of the narrow geographic limitation. And I don't find that the public interest, with the caveat involving the period of time, to be unduly infringed. I find the covenant to be enforceable, then, for the narrow purpose of the CT Page 3883 temporary injunction.
The further question, however, is what activity does the covenant prohibit? By its terms, the agreement is between "Hoffnagle Associates, hereinafter referred to as COMPANY" and Henderson. The second paragraph ten of the agreement is entitled "NON-COMPETE AGREEMENT". All of the obligations are written in terms of the "company": for example, the employee is not to disclose client lists of the "company" or information about the "company's" clients to anyone. Henderson agreed[2] that for five years after the termination of the employment agreement she would not, within five miles of the city of her employment, prepare an income tax return for any of the "COMPANY'S" clients, "such clients beingdefined as taxpayers whose last filed State or Federal income tax returnswere prepared by the COMPANY (emphasis added), nor shall the employee solicit the business of such tax preparation clients for any purpose whatsoever." The remaining issue for resolution is whether a client of Terryville Tax was really a client of the "company" for the purpose of the restrictive covenant.
The literal language of the agreement does not include clients of Terryville Tax whose tax returns were prepared at that office in 2001. The language prohibits servicing such clients of the "company", which was previously defined as Hoffnagle Associates. Before 2001, the evidence suggests that although a different filing number may have been used, the ownership of the Terryville branch was the same as Hoffnagle, the employees were paid by Hoffnagle, the clients were loosely interchangeable, the offices exchanged information and resources, and so forth. There is little question that prior to 2001, the intent of the parties was to treat the Bristol and Terryville offices as one entity.
At the beginning of 2001, however, the intent quite clearly was to separate the business identities of the two operations. As stated above, Terryvillle Tax was subsumed under the ConnTax corporation and the Bristol office was not. Hoffnagle clearly intended to segregate the businesses for the purpose of selling them separately. To do this, he needed to establish entirely independent businesses. Because, as the witnesses testified, the greatest asset of the tax business reportedly is the customer base, there was a concomitant need to segregate the clients between the two businesses: for purposes of the sales of the businesses, some customers had to "belong" to one business and some to the other. One bright-line way to separate the customers, though perhaps somewhat arbitrary, was to divide them according to where the last tax return was prepared. In any event, given the events of 2001 and the fairly unambiguous language of the agreement, by October, 2001, a client of Terryville Tax was not therefore necessarily a client of Hoffnagle Associates.[3] I find, then, that a client whose last tax return was CT Page 3884 prepared by Terryville Tax in 2001 was not a client of the "Company" for purpose of the covenant not to compete, and the restrictive covenant does not bar the defendant from preparing tax returns or doing other accounting business for those customers.[4] Even if the language of the covenant not to compete should be deemed ambiguous, a reasonable difference of interpretation would be resolved against the drafter of the agreement. Sturman v. Socha, 191 Conn. 1, 9 (1983). As to the factor of probability of success on the merits, then, I find that it is likely that the plaintiff would be successful in enforcing the covenant as to taxpayers whose last tax returns were prepared by Hoffnagle Associates, but not as to those whose last tax returns were prepared by Terryville Tax.[5]
The other factors to be considered are the weighing of the benefits and the harms to both parties. I find this factor in equipoise, in that the benefits and harms are, very roughly, equal. The number of returns in issue constitutes a larger proportion of Henderson's business than the plaintiffs', but the defendant indicated that she could survive without that business and, in any event, she intends to build a general accounting practice as opposed to one predominantly based on tax preparation. The plaintiffs are harmed by losing some business, though there is turnover in any event and there is no guarantee that customers who would want to go to Henderson but for the court's injunction would remain with Hoffnagle. The documented numbers constitute less than 10% of the business of Terryville Tax, so far as is known so far.
The remaining requests for injunctive relief do not appear to be so hotly contested. Whether because of the confidentiality agreements incorporated in the January 27, 1996, document, more specifically paragraphs 8, 9, and 10, or because of the law of trade secrets,[6] it seems clear that client lists and files from either location may not be taken or used by Henderson and that none of the former customers of either location should be actively solicited by Henderson. It appeared at the hearing that Henderson did not intend to do so in any event.
There finally remains the question of the "personal clients" of Henderson. She claimed that some 28 clients[7] were "personal", in that they came to her because of family relationship or close friendship; some seven of these were pro bono clients. The non-compete agreement specifically exempted five files from its purview, and, in paragraph ten, also specifically excludes, from at least a portion of its provisions, those clients "that specifically belong to the employee." It is not entirely clear what the phrase means. Hoffnagle and Henderson expressed real differences of understanding and differences of recollection. For example, Henderson testified that she privately worked for Skye Cable, a reasonably profitable account, on her own time and with the knowledge of CT Page 3885 Hoffnagle, and it was therefore a "personal client". Hoffnagle testified that he knew nothing about Skye Cable until he performed inventory functions after she left. Though not as stark, the same general recollections applied to a number of accounts. On the other hand, some of the claimed personal accounts were family of Henderson, and there can be little dispute that she is obviously entitled to five such accounts.
In light of the uncertainties, and the burden on the plaintiff regarding injunctive relief, I will not enjoin Henderson from servicing the accounts which appear on exhibit three. However, damages may be sought for these items (as well as any other claims in the complaint), and in the fullness of time and the exercise of discovery it may be appropriate to award damages. For that matter, because this is a preliminary ruling, no future relief is either foreclosed or mandated by this ruling.
In sum, then, Nancy Henderson is prohibited, until final hearing by this court or five years from October, 2001, whichever is sooner, from:
1. Violating the covenant not to compete under date of January 27, 1996, consistent with the body of this decision. More specifically, she may not use or disclose customer lists of either Hoffnagle or Terryville Tax, nor actively solicit business specifically from clients of either. She may not within five miles of Bristol prepare an income tax return for anyone whose last income tax returns were prepared by Hoffnagle. Henderson shall return any materials or files[8] from either business, with the exception of "personal clients", by no later than March 30, 2002.
2. Violating B or C of the temporary injunction.
______________, J. Beach